SCHOCK & SCHOCK, alc.
210 So. Orange Grove Blvd. Suite 200
Pasadena, CA 91105
626-298-6446
fax 626-298-6447
[bar no. 48632, 52781]

Attorney for Debtor

FILED

MAY 26 2010

CLERK U.S BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
Deputy Clerk

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>FEY 240 NORTH BRAND, LLC, a California Limited Liability Company;<br><br>Debtor | Bankruptcy No. LA 2:09-bk-44228-AA<br><br>Chapter 11<br><br>Adv. No.<br><br>COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE |
| FEY 240 NORTH BRAND, LLC,<br>              Plaintiff<br>v.<br><br>GCS/LES,LLC, f/k/a Glendale Career Schools, Inc.<br>              Defendant | |

Fey 240 North Brand, LLC, debtor in possession, [FEY] the Plaintiff herein alleges as follows:

1. FEY filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court of the Central District of California, case number 2:09-bk-44228, on December 4, 2009.

2. The United States Bankruptcy Court for the Central District of California has jurisdiction over adversary

1

1   proceedings pursuant to 28 U.S.C. § 1334.

2       3. This is a core matter pursuant to 28 U. S.C. §§

3   157(b)(2)(K), and 157(b)(2)(A).

4       4. Venue is proper in this district pursuant to the

5   provisions of 28 U.S.C. § 1409.

6       5. FEY is informed and believes that the defendant GCS/LES,

7   LLC f/k/a Glendale Career Schools Inc., is a Nevada Limited

8   Liability Company and is the successor to Glendale Career

9   Schools Inc.  FEY is further informed and believes that at all

10  times relevant here to Glendale Career Schools, Inc., was a

11  Nevada corporation doing business in California. [Jointly

12  GLENDALE]

13      6. FEY is the owner of the property located at 240 North

14  Brand Blvd. Glendale California. [the PROPERTY]

15      6.A.  On or about November 30, 2004, the FEY'S,

16  predecessor,  and "GLENDALE," entered into a lease for a ten-

17  year lease for part of the premises located at 240 North Brand

18  Blvd. Glendale California, herein "LEASE'.   [A copy of which is

19  attached as Exhibit A]

20      7.  Under the LEASE, before the lease commenced, FEY was

21  required to complete substantial modification to the building as

22  specified in Exhibit C to the LEASE.

23      8. The LEASE Commencement date was defined as "...fifteen

24  days after the "Possession Date" defined in Exhibit C to this

25  lease".

26      9. The Possession Date was dependant on completion of the

27  tenant improvements and numerous other conditions. The most

28  relevant of these for this matter were the necessity of:

2

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

1          "(iv) a temporary occupancy Permit has been issued by the

2          appropriate governmental authorities", and (vi) "all proper

3          governmental approvals have been obtained to permit

4          Tenant's occupancy of the Premises".

5          10. Under the LEASE, paragraph 13, GLENDALE had the

6     responsibility to procure the approval of the City of Glendale

7     for the parking needed to secure the temporary occupancy Permit

8     and final occupancy permit from the City of Glendale.

9          11.   The LEASE also contained, in paragraph 9 of Exhibit C,

10    a clause regarding the payment of the holdover rent on

11    GLENDALE'S  lease for its then current location.

12         12.   The LEASE contained a provision, paragraph 11 of

13    Exhibit C,  that provided that GLENDALE  was entitled to a late

14    fee of $100,000.00 if the Possession Date did occur on or before

15    May 1, 2005.

16         13.   The LEASE contained a provision, paragraph 12 Exhibit

17    C,  that allowed GLENDALE the right to terminate the LEASE if

18    possession was not delivered on May 31, 2005.

19         14.   When possession could not be delivered by May 31,

20    2005, GLENDALE  chose not to terminate the LEASE.

21         15. The City of Glendale opposed the proposed use of the

22    PROPERTY as a school, because of numerous reasons including,

23    insufficient parking for a school. As a result there occurred

24    several years of hearings and proposals trying to solve the

25    problem regarding parking requirements with the City of

26    Glendale.

27         16. Finally, in late 2006 and early 2007, the parties

28    arrived at an understanding with the City of Glendale regarding

3

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

1   the parking, that would allow GLENDALE to occupy the PROPERTY

2   for three years, subject to several conditions. This proposal

3   was eventually approved by the City of Glendale.

4       17. Because GLENDALE'S refusal to terminate the LEASE and

5   mitigate it's damages, and the threat of legal action against

6   FEY,  and the City of Glendale's approval of a proposal that

7   would allow GLENDALE to secure the needed parking waiver, and

8   enable FEY to secure a limited conditional use permit for the

9   premises, the parties entered into a First Amendment and

10  Supplement to the Lease,  LEASE AMENDMENT. A copy of which is

11  attached hereto as Exhibit B.

12      18. The LEASE AMENDMENT  amends the LEASE to comply with

13  the conditions imposed by the City of Glendale for a limited

14  term of three years, amended the LEASE regarding FEY's

15  completion of the tenant improvements, the date for delivery of

16  possession, and for the payment of the unpaid holdover rent and

17  late delivery penalty, as an offset against the rent once the

18  LEASE commenced.

19      19.  As a part of the LEASE AMENDMENT GLENDALE was also

20  given a DEED OF TRUST on the FEY's PROPERTY to secure payment of

21  the past due payments to GLENDALE, enforceable on the occurrence

22  of certain events.

23      20. The parties were unable to reach agreement on the other

24  requirements and/or comply with  the other conditions required

25  by the City of Glendale needed to secure the conditional use

26  permit, and FEY failed to timely complete the tenant

27  improvements, and the conditional approval by the City of

28  Glendale was revoked.

4

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

1       21. Thereafter GLENDALE announced that it was going out of
2   business and eventually went out of business, allegedly moving
3   out of its old premises as of December 31, 2007. GLENDALE
4   subsequently sold its business assets and name.

5       22. On or about March 30, 2010, GLENDALE filed, but did not
6   serve on FEY  a claim in this matter, claiming that it had a
7   Secured Claim in the amount of $2,410,803.99. FEY disputes this
8   that GLENDALE has a Secured Claim and the amount of the claim.

9                         FIRST CLAIM FOR RELIEF

10                           [BREACH OF LEASE]

11      23. FEY alleges and repleads paragraphs 1 through 22,
12  inclusive, of the Complaint and incorporates then herein as
13  though set forth at length.

14      24.  Although the LEASE, in particular Exhibit C to the
15  LEASE placed a heavy burden on FEY to rapidly build out the
16  premises the parties to the LEASE were aware that as the leased
17  premises did not include any parking, it would be  impossible
18  for FEY to deliver possession if GLENDALE could not secure from
19  the City of Glendale the necessary approval for parking.

20      25.  It was GLENDALE'S responsibility to secure the
21  necessary approval for parking pursuant to the LEASE paragraph
22  13. The securing of parking, was a condition precedent to the
23  ability of FEY to secure the required certificate of occupancy
24  needed to deliver possession of the premises to GLENDALE.

25      26.  After several failed attempts to secure the necessary
26  approval from the City of Glendale, in 2005 and 2006, on or
27  about February 13, 2007, GLENDALE with the cooperation of FEY,
28  sought approval of a parking proposal that required a drastic

                                  5

1   revision of the LEASE.

2       27. To secure approval of the parking exception, which

3   would allow the FEY secure the Certificate of Occupancy, the

4   City of Glendale required:

5       1. That the number of students be reduced from 622 to 425

6          and the number of parking spaces to be used in the City

7          Parking Structure be reduced to 138.

8       2. The Parking Exception was to be granted for a maximum of

9          3 years.

10      3. That GLENDALE post a $1 million dollar bond to guarantee

11         that they vacate the building at the end of three years.

12      4. That FEY and GLENDALE enter into a covenant that the

13         DEBTOR would terminate the lease, and GLENDALE would vacate

14         the premises on or before the end of the three year term.

15      5. That FEY and GLENDALE enter into a non-binding Letter of

16         Intent for GLENDALE to lease space in the proposed San

17         Fernando Doran project.

18      6. That GLENDALE would fund two $12,500.00 scholarships.

19      28. The LEASE AMENDMENT, was part of the parties' attempt

20   to reach agreements between the parties to comply with the

21   requirements of the City of Glendale. However, the parties were

22   unable to comply with the conditions imposed by the City of

23   Glendale and the City of Glendale eventually rescinded the

24   approval.

25      29. GLENDALE had the power to terminate the LEASE at any

26   time after May 31, 2005, without suffering any damages, but

27   chose not to terminate the LEASE. As FEY was obligated to pay

28   the extra costs of GLENDALE staying at its present location,

6

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

1   GLENDALE had no real reason to diligently pursue securing the

2   required parking exception.

3       30. Regardless of any other factors, GLENDALE'S failure for

4   more than two years to secure the necessary parking exception

5   precluded and prevented FEY from being able to secure the

6   required conditional use permit and deliver possession to

7   GLENDALE. This prevention or hindrance of FEY's performance

8   operates not only as an excuse for the non  performance but is

9   also a breach of the LEASE.

10      29. GLENDALE'S failure to procure the parking exception,

11  prevented FEY from delivering possession of the premises,

12  amounted to a substantial default under the LEASE and precluded

13  GLENDALE from sustaining its claim for any damages.

14                  SECOND CLAIM FOR RELIEF

15                [FAILURE TO MITIGATE DAMAGES]

16      30. FEY alleges and reloads paragraphs one through 29,

17  inclusive, of the Complaint and incorporates then herein as

18  though set forth at length.

19      31. If the Court determines that GLENDALE does have a valid

20  secured or unsecured claim the Court still needs to determine

21  the amount of that claim.  By the middle of 2005,  GLENDALE knew

22  full well that it was going to be impossible or nearly

23  impossible to secure the needed parking exception, and because

24  of that fact FEY could not timely complete the tenants'

25  improvements and deliver possession. However, GLENDALE  refused

26  to terminate the LEASE, and simply took advantage of the

27  situation, staying its old location  and letting FEY's

28  obligations continue to increase without any effort to mitigate

                              7

1  its damages.

2      32. A party injured by a breach of a contract is required

3  to do everything reasonably possible to minimize his own loss

4  and thus reduce the damages for which the other party has become

5  liable.  The original intended delivery of possession date was

6  May 31, 2005. At which date GLENDALE could terminate the lease

7  without cause. Instead of terminating the LEASE or making any

8  attempt to modify GLENDALE'S then current lease, or to locate

9  another site, GLENDALE did nothing but let FEY's obligation

10  increase at the rate of $56,331.58 per month. By May of 2007,

11  two years later, at the execution of the LEASE AMENDMENT,

12  GLENDALE was still unwilling to terminate the LEASE, and forced

13  FEY into the LEASE AMENDMENT in an attempt to comply with the

14  conditions required by the City of Glendale to secure the

15  parking exception that GLENDALE had finally been able to

16  procure.

17      33. GLENDALE cannot recover for harm it could have foreseen

18  and avoided by reasonable effort and without undue expense.

19  GLENDALE should not be entitled to its damages beyond, June 1,

20  2005, except to the extent that it can show that it took

21  reasonable steps to renegotiate its existing lease and/or to

22  locate an alternate site for the school and/or to secure the

23  parking approval.  This would limit GLENDALE'S damages to the

24  holdover rents for March through May 2005, $168,994.74, and the

25  $100,000.00 late delivery fee.

26                  THIRD CLAIM FOR RELIEF

27      [FOR DETERMINATION OF EXTENT AND VALIDITY OF LIEN]

28      34. FEY alleges and repleads paragraphs 1 through 33,

8

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

1  | inclusive, of the Complaint and incorporates then herein as
2  | though set forth at length.
3  |     35. The DEED of TRUST held by GLENDALE is not valid and
4  | enforceable lien on the PROPERTY because the condition precedent
5  | to the enforcement of the DEED of TRUST did not occur.
6  | FOURTH CLAIM FOR RELIEF
7  | [DECLARATORY RELIEF]
8  |     36. FEY alleges and repleads paragraphs 1 through 35,
9  | inclusive, of the Complaint and incorporates then herein as
10 | though set forth at length.
11 |     37. A dispute exists between the parties as the FEY
12 | contends that:
13 | A. That the LEASE AMENDMENT, in paragraph 8(c)(i)granted
14 | GLENDALE the right to offset the holdover rent payments due
15 | GLENDALE and the $100,000.00 late fee with interest as of
16 | February 1, 2007, against the rent payable under the LEASE
17 | AMENDMENT.
18 | B. That as security for the payment of the obligation under
19 | paragraph 8(c)of the LEASE AMENDMENT, FEY granted to
20 | GLENDALE the DEED OF TRUST on the Project.
21 | C. That FEY's obligation to pay the amounts due pursuant to
22 | paragraph 8(c)(i) of the LEASE AMENDMENT does not occur
23 | until the first day of the last month of the Term of the
24 | Lease, pursuant to paragraph 8(c)(v) of the LEASE
25 | AMENDMENT.
26 | D. That the Lease commencement date has not occurred.
27 | E. That the obligation of FEY to pay the amounts due
28 | pursuant to paragraph 8(c)(i)has not occurred.

9

---

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

1  F. That pursuant to the LEASE AMENDMENT paragraph

2  8(c)(iii), FEY agreed to reimburse GLENDALE for the cost of

3  the holdover rent premiums due to the Grandview Landlord

4  from February 2007 through the month in which the

5  Commencement Date occurs.

6  G. That FEY's  obligation to pay the amounts due pursuant

7  to paragraph 8(c)(iii) of the LEASE AMENDMENT is the Lease

8  Commencement date.

9  H. That the obligation of FEY to pay the amounts due

10  pursuant to paragraph 8(c)(iii) has not occurred.

11  I. That the right of GLENDALE to foreclose on the DEED OF

12  TRUST has not occurred because the dates on which FEY's

13  obligation to pay the amounts secured thereby has not

14  occurred.

15  K. That the Notice of Default and Election to Sell recorded

16  pursuant to the terms and conditions of the DEED OF TRUST

17  is wrongful, unlawful and void.

18  L.  That any Notice of Sale recorded pursuant to the terms

19  and conditions of the DEED OF TRUST  is wrongful, unlawful

20  and void.

21  38.  The Defendants dispute the contentions set forth in

22 paragraph 14.

23  39. FET  desires a judicial determination of the rights and

24 duties of the respective parties with regards to the

25 LEASE, LEASE AMENDMENT, and DEED OF TRUST. FEY has no other

26 remedy at law which would be as speedy and adequate in

27 determining the rights and duties of the parties.

28  40. The LEASE contains an attorney fee clause and FEY as

10

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

1 | prevailing party hereunder will be entitled to their reasonable
2 | attorneys fees.

3 | FIFTH CLAIM

4 | [TO Quiet Title]

5 | 41. FEY alleges and repleads paragraphs 1 through 405,
6 | inclusive, of the Complaint and incorporates then herein as
7 | though set forth at length.

8 | 42. GLENDALE claims an interest adverse to FEY in the
9 | PROPERTY, in the GLENDALE claims it is the beneficiary under the
10 | DEED of TRUST and has the right an ability to foreclose on the
11 | PROPERTY, whereas GLENDALE contends that GLENDALE has no rights
12 | or ability to foreclose on the PROPERTY because GLENDALE
13 | breached the LEASE and the conditions precedent to GLENDALE's
14 | right to enforce the DEED of TRUST, the delivery of possession
15 | and the commencement of the LEASE never occurred.

16 | 43. FEY is seeking to quiet title against the claim of
17 | GLENDALE and a that the claim of GLENDALE under the DEED of
18 | TRUST is without merit and that GLENDALE has no right, title,
19 | estate, lien or interest whatsoever in the Prooperty.

20 | WHEREFORE, FEY prays judgment against GLENDALE, as follows:
21 | 1. On the First Claim for Breach of the LEASE.

22 | A. For a determination that GLENDALE breached the LEASE.
23 | 2. On the Second Claim for failure to mitigate:

24 | A. For a determination that GLENDALE failed to mitigate its
25 | damages.

26 | 3. On the Third Claim:

27 | A. For a determination that the DEED of TRUST is invalid
28 | and unenforceable.

11

---

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

1  4. On the Fourth Claim:

2      A. That the LEASE AMENDMENT, in paragraph 8(c)(i)granted

3  GLENDALE the right to offset the holdover rent payments due

4  GLENDALE and the $100,000.00 late fee with interest as of

5  February 1, 2007, against the rent payable under the LEASE

6  AMENDMENT.

7      B. That as security for the payment of the obligation under

8  paragraph 8(c)of the LEASE AMENDMENT, FEY granted to GLENDALE

9  the DEED OF TRUST on the Project.

10     C. That FEY's obligation to pay the amounts due pursuant to

11 paragraph 8(c)(i) of the LEASE AMENDMENT does not occur until

12 the first day of the last month of the Term of the Lease,

13 pursuant to paragraph 8(c)(v) of the LEASE AMENDMENT.

14     D. That the Lease commencement date has not occurred.

15     E. That the obligation of FEY to pay the amounts due

16 pursuant to paragraph 8(c)(i)has not occurred.

17     F. That pursuant to the LEASE AMENDMENT paragraph

18 8(c)(iii), FEY agreed to reimburse GLENDALE for the cost of the

19 holdover rent premiums due to the Grandview Landlord from

20 February 2007 through the month in which the Commencement Date

21 occurs.

22     G. That FEY's  obligation to pay the amounts due pursuant

23 to paragraph 8(c)(iii) of the LEASE AMENDMENT is the Lease

24 Commencement date.

25     H. That the obligation of FEY to pay the amounts due

26 pursuant to paragraph 8(c)(iii) has not occurred.

27     I. That the right of GLENDALE to foreclose on the DEED OF

28 TRUST has not occurred because the dates on which FEY's

12

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

obligation to pay the amounts secured thereby has not occurred.

K. That the Notice of Default and Election to Sell recorded pursuant to the terms and conditions of the DEED OF TRUST  is wrongful, unlawful and void.

L.  That any Notice of Sale recorded pursuant to the terms and conditions of the DEED OF TRUST  is wrongful, unlawful and void.

5. On the Fifth Claim:

A. That GLENDALE has no right, title, estate, lien or interest whatsoever in the PROPERTY.

6. On all claims:

A. For damages according to proof at the time of trial.

B. For attorney fees and the costs of suit incurred in this action; and, for such other and further relief as the court deems proper.

Dated: May 17, 2010                    Respectfully submitted,
                                       SCHOCK & SCHOCK, alc.
                                       Attorneys for Debtor

                                       by:
                                       _____

                                          John P. Schock

COMPLAINT FOR BREACH OF CONTRACT; TO DETERMINE EXTENT AND
VALIDITY OF LIEN; FOR DECLARATORY RELIEF; AND TO QUIET TITLE

EXHIBIT A

LEASE

By and between

240 NORTH BRAND ASSOCIATES, LLC,

a California limited liability company

as Landlord,

and

GLENDALE CAREER SCHOOLS, INC.,

a Nevada corporation

as Tenant.

Dated November ⁊⁊, 2004

I-609991.5
11/16/2004
13771.03

TABLE OF CONTENTS

I.    SUMMARY OF BASIC LEASE PROVISIONS ("Lease Summary") ................................ 3
    1.    Premises ................................................................................................................. 4
    2.    Term ....................................................................................................................... 4
    3.    Renewal Terms ...................................................................................................... 4
    4.    Use of Premises; Access ....................................................................................... 5
    5.    Rent ........................................................................................................................ 5
    6.    Insurance ................................................................................................................ 9
    7.    Indemnification .................................................................................................... 11
    8.    Waiver of Subrogation ........................................................................................ 11
    9.    Services and Utilities .......................................................................................... 11
    10.   Common Areas ..................................................................................................... 12
    11.   Alterations ............................................................................................................ 13
    12.   Tenant Improvements .......................................................................................... 13
    13.   Parking ................................................................................................................. 13
    14.   Signs ..................................................................................................................... 14
    15.   Damage or Destruction ........................................................................................ 15
    16.   Repairs ................................................................................................................. 15
    17.   Entry ..................................................................................................................... 16
    18.   Condemnation ...................................................................................................... 16
    19.   Tenant's Default; Landlord's Remedies; General Default Provisions ............... 17
    20.   Landlord's Default; Tenant's Remedies ............................................................. 19
    21.   Rules and Regulations ......................................................................................... 19
    22.   Assignment and Subletting .................................................................................. 19
    23.   Subordination, Non-Disturbance and Attornment .............................................. 21
    24.   Estoppel Certificate ............................................................................................. 21
    25.   Short Form Memorandum of Lease ..................................................................... 22
    26.   Force Majeure ...................................................................................................... 22
    27.   Landlord's Authority ........................................................................................... 22
    28.   Tenant's Authority ............................................................................................... 22
    29.   Broker's Commission .......................................................................................... 22
    30.   Exculpation .......................................................................................................... 22
    31.   Surrender; Holdover ............................................................................................. 23
    32.   Notices ................................................................................................................. 23
    33.   Successors and Assigns ....................................................................................... 24
    34.   Covenant of Quiet Enjoyment ............................................................................ 24
    35.   Relationship of Parties ........................................................................................ 24
    36.   Section Headings ................................................................................................. 24
    37.   Complete Agreement ........................................................................................... 24
    38.   Waiver .................................................................................................................. 24
    39.   Jurisdiction ........................................................................................................... 24
    40.   Counterparts ......................................................................................................... 24
    41.   Exhibits ................................................................................................................ 24
    42.   Exclusive .............................................................................................................. 25
    43.   Rights Reserved to Landlord ............................................................................... 25
    44.   Sale by Landlord .................................................................................................. 25

| 45. | Taxes Payable by Tenant | 25 |
| 46. | Interest and Service Charges | 25 |
| 47. | WAIVER OF JURY TRIAL | 26 |
| 48. | No Merger | 26 |
| 49. | Partial Invalidity | 26 |
| 50. | No Landlord Security Obligations | 26 |
| 51. | Light and Air | 26 |
| 52. | Portions of the Premises Reserved to Landlord | 27 |
| 53. | Cleaning | 27 |
| 54. | Lease Addendum | 27 |

II.  LEASE ADDENDUM

| 55. | Communications Equipment | 1 |
| 56. | Telecommunications | 1 |
| 57. | Hazardous Materials | 1 |

1-609991.5
11/16/2004
13771.03

LEASE

THIS LEASE ("Lease") is made as of the _____ day of November, 2004, between 240 NORTH BRAND ASSOCIATES, LLC, a California limited liability company ("Landlord"), and GLENDALE CAREER SCHOOLS, INC., a Nevada corporation ("Tenant").

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, covenant and agree as set forth below:

I.    SUMMARY OF BASIC LEASE PROVISIONS ("Lease Summary").  The following capitalized terms shall have the meanings set forth in this Section A:

A.   Landlord:  240 NORTH BRAND ASSOCIATES, LLC.

B.   Tenant:  GLENDALE CAREER SCHOOLS, INC.

C.   Building:  240 North Brand Blvd., Glendale, CA 91203.  Project:  The Building, facilities appurtenant to the Building, and the land on which the Building and appurtenant facilities are located, as shown on the Site Plan ("Site Plan") attached as Exhibit A to this Lease, such land being more particularly described in Exhibit A-1 to this Lease.

D.   Premises:  Approximately 35,000 square feet of Rentable Area on the ground and basement floor(s) of the Building, as generally shown on the floor plan attached to this Lease as Exhibit B.  The Rentable Area of the Premises and the Building shall be determined by Landlord and agreed to by Tenant in accordance with the standards set forth in ANSI Z65.1-1996, as promulgated by the Building Owners and Managers Association (BOMA).

E.   Rentable Area of Premises:  35,000 square feet; Building Square Footage: approximately 58,000 square feet.  The square footage of the Premises and the Building shall be determined as provided in paragraph D above.

F.   Initial Term:  Ten (10) years, beginning on the "Commencement Date" and ending at midnight on the "Expiration Date" as more particularly set out in Section 2.  The Expiration Date may be extended pursuant to exercised Renewal Terms.

G.   Commencement Date:  The date determined under Section 2(a) below.

H.   Renewal Options:  Two (2) renewal options of Five (5) years each (each, a "Renewal Term"), as more particularly set out in Section 3 below.

I.   Base Rent:  During the first twelve (12) months of the Lease Term, Base Rent shall be Six Hundred Sixty Thousand Dollars ($660,000.00) ($55,000.00 per month), based on a rental rate of $22.00 per square foot of Rentable Area in the Premises and Base Rent being charged against 30,000 square feet during the first two (2) "Lease Years" of the "Term" (each as defined in Section 2(a)).  Base Rent shall be increased in accordance with Section 5 below.

J.   Notice Addresses:  (See Section 32 for Notice requirements):

H-3

1.    Tenant's Notice Address: 1015 Grandview Avenue, Glendale California 91201, with copies to Daniel E. Sykes, Vice President, 150 West Brambleton Avenue, Norfolk, Virginia 23510, Guy R. Friddell, III, Esquire, 150 West Brambleton Avenue, Norfolk, Virginia 23510 and Stephen R. Davis, Esquire, Willcox & Savage, P.C., 222 Central Park Avenue, Suite 1500, Virginia Beach, Virginia 23462, Fax #: 757-628-5659.

2.    Landlord's Notice Address: Dorn-Platz Properties, 344 N. Central Avenue. P.O. Box 1965, Glendale, CA 91203-1965 Attention: Mark S. Knapp, with a copy to Thomas Whitelaw & Tyler LLP, 18101 Von Karman Avenue, Suite 230, Irvine, CA 92612 Attention: William S. Sanderson, Esq.

K. Broker: Julien J. Studley, Inc.

L. Parking Spaces: See Section 13 below.

M. Initial Tenant Charges: Eighty-Six Thousand One Hundred Dollars ($86,100.00) per year; Seven Thousand One Hundred Seventy-Five Dollars ($7,175) per month, based on $2.87 per square foot of Rentable Area in the Premises. The initial Tenant Charges are based on 30,000 square feet of Rentable Area in the Premises for the first two (2) Lease Years (as defined in Section 2(a)). Commencing with the third Lease Year, Tenant Charges shall be determined based on 35,000 square feet of Rentable Area in the Premises.

If any of the provisions of this Lease set forth below conflict with this Lease Summary, the specific Lease provisions shall govern.

1.    Premises. Subject to and upon the terms, provisions and conditions set forth in this Lease, and in consideration of the duties, covenants and obligations of each other under this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises.

2.    Term.

(a)    The Initial Term of this Lease shall be for the period set forth in the Lease Summary. The Commencement Date shall be the date that is fifteen (15) days after the "Possession Date" defined in Exhibit C to this Lease. Upon the request of either party, Landlord and Tenant agree to execute a lease addendum confirming the actual Commencement Date and Expiration Date when the same are finally determined. As used in this Lease, the word "Term" shall refer to the Initial Term and all Renewal Terms (if any) exercised, and the term "Lease Year" shall mean a twelve (12) month period commencing on the Commencement Date for the first Lease Year and commencing on each anniversary of the Commencement Date for each subsequent Lease Year.

(b)    Landlord's Work. Set forth on Exhibit C attached to this Lease are various items of "Landlord's Work". Landlord agrees to perform all of Landlord's Work in accordance with the provisions of Exhibit C.

3.    Renewal Terms. Tenant may extend the term of this Lease by exercising one or more of the Renewal Options. All terms and conditions of this Lease shall continue in each

4

Renewal Term, except that Base Rent shall be adjusted in accordance with Exhibit D. Tenant shall give Landlord written notice of its exercise of a Renewal Option at least twelve (12) months prior to the expiration of the then current Term. If Tenant neglects to timely exercise any Renewal Option, Tenant's right to exercise such Renewal Option shall not expire or lapse unless Tenant fails to exercise such Renewal Option with fifteen (15) days after Tenant's receipt of written notice from Landlord of Tenant's failure to timely exercise the Renewal Option. If Tenant fails to exercise its Renewal Option for any Renewal Term, any subsequent extension rights shall lapse. The Renewal Options are not assignable separate and apart from this Lease, nor may the Renewal Options be separated from this Lease in any manner, either by reservation or otherwise.

      4.    Use of Premises; Access.

      (a)    The Premises may be used for a career/technical school, administrative or general office purposes and for any related ancillary purposes.

      (b)    Tenant agrees that its use of the Premises shall be in conformity with all applicable federal, state and local laws, ordinances and regulations and shall comply with local zoning requirements.

      (c)    Landlord warrants that the Project is currently zoned to allow Tenant's use as set forth in subparagraph (a) above.

      (d)    Subject to factors beyond Landlord's control and subject to the other provisions of this Lease, including, without limitation, Sections 15 and 18, Tenant shall have access to the elevator, parking facilities, Building and Premises 24 hours per day, seven (7) days per week.

      5.    Rent. Tenant agrees to pay Landlord the following amounts (individually and collectively referred to as "Rent"):

      (a)    (i)    Base Rent. Base Rent shall be payable in equal monthly installments, in advance. The first payment of Base Rent shall be due on the Commencement Date, and the second subsequent monthly payment shall be made on the first day of each and every calendar month thereafter. If the Term begins on a date other than on the first day of the month or ends other than on the last day of a month, Base Rent for any such month shall be prorated on a daily basis (at the rate of 1/365th of the annual Base Rent) for each day the Term of this Lease is in effect for such month.

      (ii)    Increases in Base Rent. Base Rent shall be increased throughout the Term and any Renewal Term pursuant to Exhibit D -- Base Rent Adjustment -- attached to this Lease.

      (b)    Taxes, Insurance Charges and Operating Expenses. Tenant shall pay to Landlord as additional rent Tenant's Percentage of the Real Estate Taxes, Insurance Charges and Operating Expenses incurred during each fiscal year. The terms Tenant's Percentage, Real

Estate Taxes, Insurance Charges and Operating Expenses shall have the meanings set forth in this Section 5(b).

The term "Real Estate Taxes" shall include all ad valorem real estate taxes, charges and general and special assessments levied on the Building, which Landlord agrees to pay promptly when due. However, Real Estate Taxes shall not include penalties, interest or franchise, capital stock, income, estate or inheritance taxes personal in nature to Landlord. Notwithstanding anything contained herein to the contrary, if at any time during the Initial Term Landlord sells or transfers the Project, the Building or any part thereof, or if a "change of ownership" (as defined in California Revenue Code Sections 60 and 61 "Proposition 13") or new construction on the Project (each a "Reassessment Event") occurs, and as a result of any such Reassessment Event, the Real Estate Taxes increase pursuant to a reassessment under the terms of Proposition 13 or any successor statute ("Reassessment"), Tenant's Percentage of Real Estate Taxes during the Initial Term shall not be affected by such Reassessment ("Prop 13 Protection"). Except as expressly set forth below, Tenant's Percentage of Real Estate Taxes shall increase by no more than two percent (2%) per year during the Initial Term.

If a Reassessment occurs during the Initial Term, Landlord shall have the right at any time thereafter to require Tenant to pay its full Tenant's Percentage of Real Property Taxes after giving effect to the Reassessment if Landlord pays to Tenant an amount equal to the present value of Tenant's Percentage of the increased amount of Real Estate Taxes for the remainder of the Initial Term using a discount rate of eight percent (8.0%) for the number of years (or fractions thereof) remaining in the Initial Term as of the date of such payment. The formula for determining the amount of the payment is: [(A x B x C) (discounted at 8.0% per year remaining in the Initial Term)], where

A = increased annual amount of Real Property Taxes on a per square foot basis;

B = the square footage of the Premises; and

C = the number of years (or fraction thereof) remaining in the Initial Term.

By way of example, if following a Reassessment at the end of the third Lease Year Tenant's Percentage of Real Property Taxes were to increase by $1.00 per square foot per year, Landlord would have the option to pay to Tenant an amount equal to ($1.00 x 35,000 square feet x 7) discounted at the rate of 8.00% per year remaining in the Initial Term. If Landlord elects to make such payment at a later date, the calculation shall be adjusted to reflect the shorter remaining time in the Initial Term. Prop 13 Protection shall not be applicable to any Renewal Term.

The term "Insurance Charges" shall include all insurance premiums attributable to the insurance required to be carried by Landlord with respect to the Building pursuant to Section 6 of this Lease.

The term "Operating Expenses" shall include all expenses incurred or paid on behalf of Landlord in connection with the operation and maintenance of the Building and

6

related facilities, including all costs incurred relating to the maintenance and repair of the Building and its facilities, general maintenance services, janitorial services, cleaning, sweeping, snow and ice removal and repair of common areas adjoining the Building, all utility costs, including all costs in connection with the furnishing of air-conditioning, water, heating and electricity, and amortization of the cost of capital investment items that are primarily for the purpose of reducing Operating Expenses. All such capital costs shall be amortized over the reasonable life of the capital investment item, with the reasonable life and amortization schedule being determined in accordance with generally accepted accounting principles. In the case of installations for the purpose of reducing Operating Expenses, Landlord, upon Tenant's request, will provide a cost justification for the practicality of such installations. The term "Operating Expenses" shall specifically exclude the following: (A) except as provided above, any capital improvements or capital repairs made to the Project or Building except if such improvements or repairs reduce Operating Expenses as provided above; (B) expenses related to the maintenance and/or repair of the roof or structural portions of the Building; (C) painting, redecorating or other tenant improvements or work that Landlord performs for any tenant or occupant in the Building; (D) any repairs or other work occasioned by fire, windstorm or other casualty covered by insurance actually maintained by Landlord with respect to the Building or required to be maintained by Landlord under this Lease; (E) repairs resulting from defects in the construction of the Building or equipment installed in the Building; (F) leasing commissions and advertising expenses relating to leasing and procuring new tenants for the Building; (G) accounting fees and legal expenses incurred in enforcing the terms of any lease in the Building; (H) interest or amortization payments on any mortgage or mortgages that are liens on the Building or on any ground lease; (I) rents payable by Landlord with respect to the Project and/or the Building, (J) management fees in excess of those charges by landlords of comparable buildings in the greater Glendale, California area, and (K) Real Estate Taxes and Insurance Charges.

Landlord and Tenant acknowledge that the Premises is separately metered for utilities and that the HVAC system serving the Premises will be separately sub-metered. Accordingly, notwithstanding the foregoing, Tenant shall pay monthly the actual cost of utilities charged to the Premises and the utilities indicated by the submeter for the HVAC system serving the Premises. Therefore, only Common Area utilities charges shall be included in Operating Expenses, and utilities charges for the Premises and other tenant space and for the HVAC system serving the Premises and other tenant space will not be included in Operating Expenses.

"Tenant's Percentage" shall be based on a fraction, the numerator of which is the Rentable Area of the Premises and the denominator of which is the total Building Square Footage.

Landlord shall estimate the amounts that Tenant will owe for Operating Expenses, Real Estate Taxes and Insurance Charges (collectively the "Tenant Charges") for each fiscal year, and Tenant shall pay one-twelfth of such estimate of Tenant Charges on a monthly basis in advance together with payment of Base Rent. As of the Commencement Date, the Tenant Charges shall be equal to the "Initial Tenant Charges" amount set forth in the Lease Summary. Landlord shall furnish Tenant annually (within three (3) months after the end of each fiscal year) with a statement of the actual Tenant Charges for the period in question ("Statement"), and there shall be an adjustment between Landlord and Tenant of Tenant Charges

owed by Tenant for such period. Any amount owed to Landlord for an underpayment of the actual Tenant Charges shall be made within thirty (30) days after receipt by Tenant of the billing therefor. Any overpayment shall be credited against Tenant's next payment of Tenant Charges (or paid to Tenant at the time the annual reconciliation statement is submitted if at or past the expiration of the Term). Landlord may revise the estimate of Tenant Charges annually and change Tenant's monthly estimated payment of Tenant Charges accordingly based on the actual expenses for the prior year reflected in the annual statement. Tenant Charges at the beginning or end of the Term for periods of less than twelve (12) full calendar months shall be equitably prorated. The term "fiscal year" shall refer to a calendar year period or such other twelve (12) month period as reasonably selected by Landlord. Tenant shall have the right, at all reasonable times and at Tenant's own expense, to audit Landlord's books and records relating to the Tenant Charges. Landlord shall retain all books and records for three (3) years after the end of the fiscal year to which such books and records apply. If Tenant's audit reveals an overpayment of the Tenant Charges by Tenant of more than three percent (3%), Landlord shall reimburse Tenant for the reasonable third-party costs of such audit actually incurred by Tenant.

Tenant Charges shall be "net" only and shall therefore be reduced by all cash discounts, trade discounts, quantity discounts, rebates, refunds, credits, or other amounts received by Landlord or Landlord's managing agent, including any such related amounts from tenants of the Building, for its purchase of or provision of any goods, utilities, or services. Landlord shall not (i) profit by including items in Tenant Charges that are otherwise also charged separately to others, or (ii) collect Tenant Charges from Tenant and all other tenants/occupants in the Building in an amount in excess of what Landlord actually incurred for the items included in Tenant Charges.

(c)     Real Estate Tax Protest. Landlord agrees to join Tenant, at Tenant's request and expense, to protest any Real Estate Tax assessment. Any reduction or rebate of Real Estate Taxes shall be paid to the Tenant based on Tenant's Percentage. Alternatively, at the written request of tenants occupying at least seventy-five percent (75%) of the Building ("Requesting Tenants"), Landlord shall bring proceedings to contest the validity or amount of any Real Estate Tax assessment or to recover payments therefor; provided that the Requesting Tenants shall cooperate with Landlord with respect to such proceedings to the extent reasonably necessary and each Requesting Tenant shall pay Landlord such tenant's percentage of all actual costs, fees and expenses incurred in connection with such proceedings as additional rent promptly upon being billed.

(d)     Right to Audit. The payment by Tenant of any Tenant Charges pursuant to this Lease shall not preclude Tenant from questioning the accuracy of any statement provided by Landlord. Tenant, or its authorized agent, shall have the right, at its own cost and expense (without requirement that Tenant pay Landlord's costs of complying with this provision), to inspect and/or audit Landlord's detailed records each year with respect to Tenant Charges, as well as all other rent payable by Tenant pursuant to this Lease during the Lease Term to ensure the Landlord is complying with all requirements of this Lease. Pursuant to the foregoing, Landlord shall be obligated to retain such records until one (1) year following the termination of this Lease. Within one (1) year after receipt of a Statement by Tenant, Tenant may give Landlord written notice ("Review Notice") that Tenant intends to review Landlord's records of the Tenant

8

Charges set forth in that Statement. Within a reasonable time after receipt of the Review Notice, Landlord shall make all pertinent records available for inspection that are reasonably necessary for Tenant to conduct its review. Tenant shall be solely responsible for all costs, expenses and fees incurred in connection with the audit, except as provided below. Within sixty (60) days after the records are made available to Tenant, Tenant shall have the right to give Landlord written notice (an "Objection Notice") stating in reasonable detail any objection to the Statement for that year. If Tenant fails to give Landlord an Objection Notice within the sixty (60) day period or fails to provide Landlord with a Review Notice within the one (1) year period described above, Tenant shall be deemed to have approved Landlord's Statement and shall be barred from raising any claims regarding the Tenant Charges for that year (except that if a subsequent audit by Tenant reveals a discrepancy in Tenant Charges, Tenant will have the right to review the Landlord's Statements for the prior three (3) years with respect to such discrepancies and receive any appropriate adjustment/refund). If Tenant provides Landlord with a timely Objection Notice, Landlord and Tenant shall work together in good faith to resolve any issues raised in Tenant's Objection Notice. If Landlord and Tenant determine that Tenant Charges for the calendar year are less than reported, Landlord shall provide Tenant with a credit against the next installment of rent in the amount of the overpayment by Tenant. Likewise, if Landlord and Tenant determine that Tenant Charges for the calendar year are greater than reported, Tenant shall pay Landlord the amount of any underpayment within thirty (30) days. The records obtained by Tenant shall be treated as confidential. In no event shall Tenant be permitted to examine Landlord's records or to dispute any Statement unless Tenant has paid and continues to pay all rent when due. Pending completion of any such audit, Tenant agrees to pay Landlord any such disputed Tenant Charges. In no event shall this Section 5(d) be deemed to allow any review of any of Landlord's records by any subtenant of Tenant. If such audit discloses that the amount paid by Tenant has been overstated by more than three percent (3%), then, in addition to immediately repaying such overpayment and associated interest to Tenant, Landlord shall also pay the costs incurred by Tenant in connection with such audit.

(e)     General Rent Provisions. Tenant will pay, without notice, demand, deduction, offset or abatement, except as may otherwise be expressly set forth in this Lease, all Rent to Landlord at Landlord's primary address for notices under Section 32 below or to such other party or to such other address as Landlord may designate by written notice from time to time. If not otherwise expressly provided in this Lease, all payments of (i) Base Rent and Tenant's Percentage of Real Estate Taxes, Insurance Charges and Operating Expenses shall be due on the next due date for Base Rent; (ii) utilities charges for the Premises shall be due within ten (10) business days after written demand therefore; and (iii) unless otherwise provided for in this Lease, all other amounts payable by Tenant to Landlord shall be due not later than thirty (30) days after Tenant's receipt of an itemized billing therefor.

6.     Insurance.

(a)     Landlord shall maintain fire and all-risk property and casualty insurance on the Building, with extended coverage endorsements, in such reasonable amounts and with such reasonable deductibles as would be carried by a prudent owner of a similar building in the city in which the Building is located and including both an agreed amount endorsement and

9

replacement cost endorsement, and such other insurance as may be required by law or Landlord's lender.

(b)      Landlord and Tenant shall maintain comprehensive liability insurance including public liability and property damage, on the Project and the Premises, respectively, with a limit of not less than One Million Dollars ($1,000,000.00) combined single limit coverage. A certificate of the applicable insurance coverage shall be furnished by each party upon written request. Each policy shall include an undertaking by the insurer to give the other party to this Lease ten (10) days' prior written notice of any cancellation, non-renewal, or change in scope or amount of coverage of such policy. Landlord and Tenant shall be named as additional insureds on the respective insurance policies of the other party.

(c)      Tenant shall carry and maintain a policy or policies of property insurance in the name of Tenant covering Tenant's leasehold improvements and any property of Tenant at the Premises and providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended peril ("all risk" or Special Form) and sprinkler leakage, in such reasonable amounts and with such reasonable deductibles as would be carried by a prudent tenant in a similar building in the city in which the Building is located, with an agreed amount endorsement, and providing protection against loss of income and extra expense. Any proceeds from such insurance shall be used for the repair or replacement of the property damaged or destroyed, unless this Lease is terminated pursuant to the provisions hereof. Notwithstanding the foregoing or any other provision of this Lease to the contrary, Tenant shall have the right to self-insure with respect to the risks covered by the insurance contemplated under this Section 6(c), in which event Tenant shall be deemed fully insured with respect to such risks for all purposes of this Lease, including Section 8 below.

(d)      Tenant shall carry and maintain a policy or policies of workers' compensation and employers' liability insurance in compliance with all applicable laws.

(e)      All of the policies required to be obtained by Landlord or Tenant pursuant to the provisions of this Section 6 shall be issued by insurers licensed to do business in California, with a rating and financial size of not less than A-; X in the most current available "Best's Insurance Reports". Tenant shall, prior to delivery of the Premises by Landlord to Tenant, provide Landlord with certificates, in the form of an ACORD 27 certificate (or its equivalent, if no longer available) for all insurance policies. All insurance policies shall provide that they may not be altered or cancelled until after at least ten (10) days' written notice to Landlord and to any other additional insureds thereunder. Tenant shall, at least thirty (30) days prior to the expiration of any of such policies, furnish Landlord with a renewal or binder therefor. Tenant may carry insurance under a so-called "blanket" policy, provided that such policy provides that the amount of insurance required hereunder shall not be prejudiced by other losses covered thereby. All insurance policies (except Workers' Compensation policies) carried by Tenant shall be primary with respect to, and non-contributory with, any other insurance available to Landlord. Such policies shall provide that the interests of Landlord and any other additional insureds designated by Landlord shall not be invalidated due to any breach or violation of any warranties, representations or declarations contained in such policies or the applications therefor.

10

7.    Indemnification.

(a)    Tenant agrees to indemnify, defend and save Landlord harmless from any and all loss, claim or damage (including reasonable attorney's fees), from and after the date on which Landlord delivers possession of the Premises to Tenant by reason of any accident, injury or damage to any person or property occurring in, upon or about the Premises, except as may be caused by or result from the negligence or willful misconduct of Landlord, its agents or employees, or Landlord's failure to perform its obligations under this Lease.

(b)    Landlord agrees to indemnify, defend and save Tenant harmless from any and all loss, claim or damage (including reasonable attorney's fees) by reason of any accident, injury or damage to any person or property occurring in, upon or about (i) the Premises prior to the date on which Landlord delivers possession of the Premises to Tenant or as a result of the negligence or willful misconduct of Landlord, its agents or employees, or (ii) elsewhere in the Project (other than the Premises), except as may be caused by or result from the negligence or willful misconduct of Tenant, its agents or employees, or Tenant's failure to perform its obligations under this Lease.

8.    Waiver of Subrogation.  Landlord and Tenant mutually release and discharge each other (as well as the officers, directors, partners, agents and employees of each other) from responsibility and liability (by way of subrogation or otherwise) for loss or damage to any building, structure or other real or personal property of the other, or any resulting loss of income, that may arise from a fire or other peril that is covered by insurance or could be covered under an "all risk" or "special" form insurance policy. The above releases also shall apply to any third party, including any insurance company, claiming through or under a party as a result of a right of subrogation. All insurance policies required to be maintained by the parties on such real or personal property shall contain "waiver of subrogation" clauses to carry out these release provisions.

9.    Services and Utilities.  Landlord covenants and agrees with Tenant:

(a)    To cause public utilities to furnish the electricity, gas and water utilized in operating any and all facilities serving the Premises.  Tenant shall, at its sole cost and expense, contract with the local public utility for electricity service to the Premises which shall be separately metered.

(b)    To furnish (at no cost to Tenant except as expressly provided in this Lease) to Tenant:

(i)    (A)    Hot and cold water at those points of supply provided for general use of tenants in the Building; (B) heat and air-conditioning, at such temperatures and in such amounts as set forth in Exhibit H attached to this Lease regarding HVAC, and otherwise as set forth below; and (C) all necessary maintenance and electric lighting service for all public areas and special service areas of the Building.

(ii)    Electrical facilities to furnish sufficient power for use of the Premises in accordance with Section 4 of this Lease.

11

(iii)    All original Building standard lighting fixtures and lamps within the Premises necessary to provide adequate lighting in all areas.

(iv)    Elevator service to provide reasonably prompt access to the Premises at all times.

(c)    Landlord shall provide to Tenant, at no cost to Tenant, space adjacent to the Building or in the Project, at a location to be mutually agreed upon, to accommodate Tenant's requirement for a generator and fuel supply, water make-up tank and associated pump equipment and, if available, space in the Building's risers and utility closets for hooks ups/connections.

(d)    If Landlord fails to provide any of the above services or utilities under (i) through (v) or any other services or utilities that affect Tenant's use or occupancy of the Premises and such failure continues for a period in excess of two (2) business days, all Rent shall abate for a period ending two (2) business days after the applicable service(s) or utility(ies) is restored. Landlord shall use its best efforts to maintain in continuous effect all services and utilities and shall promptly and diligently restore all services and utilities when repairs are required.

(e)    For purposes of this Lease, Normal Business Hours shall be Monday through Thursday, 7:00 a.m. to 10:30 p.m., Friday from 7:00 a.m. to 6:00 p.m. and Saturdays from 8:00 a.m. to 1:00 p.m.

(f)    All utilities serving the Premises are, or shall be prior to the Possession Date (as defined in Exhibit C), separately metered or submetered.

10.    Common Areas.

(a)    The term "Common Areas" shall mean (i) the interior stairwells, (ii) the lobbies and main entrance area, (iii) common restroom facilities, and (iv) the sidewalks and other common and service areas around the Building with the improvements therein or thereon.

(b)    Tenant and Tenant's customers, employees and invitees shall have the right, in common with all other tenants and occupants of the Building and their respective customers, employees and invitees, to the non-exclusive use of the Common Areas  There is no parking lot or parking spaces dedicated to this building; all the parking is in City of Glendale owned parking lots.

(c)    Landlord shall operate, manage, equip, light, repair, clean and maintain the Common Areas for their intended purposes. Landlord shall perform such obligations in conformity with first-class office building standard and keep all Common Areas in a good state of repair.

(d)    Landlord agrees to remove snow and ice from the entranceways and sidewalks promptly.

1-609991.5
11/16/2004
13771.03

11.    Alterations.

(a)    Tenant shall not make any alterations, additions or improvements (collectively "Alterations") of a structural nature in or to the Premises or any Alterations to the exterior of the Premises, without Landlord's consent, which shall not be unreasonably withheld or delayed. Interior, non-structural Alterations shall not require Landlord's consent.

(b)    All work and alterations performed by or on behalf of Tenant shall be done in a good and workmanlike manner, and Tenant shall ensure that all of Tenant's contractors engaged in such work shall at all times maintain workmen's compensation insurance and adequate public liability and property damage insurance. Tenant agrees to indemnify Landlord for any damages resulting from any mechanic's lien being filed on the Premises and to release any such lien within thirty (30) days after receipt of written notice of such filing.

(c)    Tenant shall keep the Project free from any liens arising out of any work performed, material furnished or obligations incurred by Tenant. In the event that Tenant shall not, within twenty (20) days following the imposition of any such lien, cause the same to be released of record by payment or posting of a proper bond, Landlord shall have, in addition to all other remedies provided herein and at law or in equity, the right, but no obligation, to cause same to be released by such means as it shall deem proper including, but not limited to, payment of the claim giving rise to such lien. All such sums paid by Landlord and all expenses incurred by it in connection therewith shall be considered additional rent and shall be payable to it by Tenant on demand. Landlord shall have the right at all times to post and keep posted on the Premises any notices permitted or required by law, or which Landlord shall deem proper, for the protection of Landlord, the Project and any other party having an interest therein from mechanics' and materialmen's liens, and Tenant shall give to Landlord at least five (5) business days' prior notice of commencement of any work on the Premises.

12.    Tenant Improvements. All alterations, decorations, additions and improvements made by Tenant or by Landlord on Tenant's behalf pursuant to the provisions of this Lease shall remain the property of the Tenant during the Term. Upon the expiration of this Lease, Tenant may remove from the Premises, within ten (10) days after the Term expires, all personal property, equipment, trade fixtures, special lighting fixtures and signage belonging to Tenant. All other alterations, additions and improvements made a part of the Premises shall remain in the Premises. Trade fixtures are those additions and improvements affixed or attached to or located in the Premises and specifically related to Tenant's business. Landlord waives any lien or claim with respect to all trade fixtures, furniture, furnishings, office and classroom equipment and signs of Tenant (collectively "Tenant Property") provided by law, this Lease or otherwise and agrees that the Tenant Property shall not be subject to distraint or execution by, or any claim of, Landlord.

13.    Parking.

(a)    Landlord will cooperate with and assist Tenant in securing an adequate number of parking spaces in the city parking garage at the corner of California and Orange Streets. Additionally, Landlord will assist Tenant in securing reserved parking for Tenant's student prospects and other visitors in the surface parking lot at the rear of the Building. The

13

cost of parking shall be shared equally between Landlord and Tenant during the first ten (10) Lease Years. Thereafter parking shall be at the sole cost and expense of Tenant.

(b) Landlord's share of parking costs during the first ten Lease Years shall be billed by Tenant to Landlord on a monthly basis, with such share being payable by Landlord to Tenant within thirty (30) days after Tenant submits an itemized written billing therefor, together with bills, invoices and sufficient evidence to document the bill. Such bill shall detail the entire monthly cost of parking and Landlord shall be responsible for fifty percent (50%) of the total documented monthly amount. If Landlord fails to make any such payment within the foregoing thirty (30) day period and such failure continues for a period of three (3) business days after Tenant gives Landlord a written reminder notice (which reminder notice will specifically reference this Section 13 and Tenant's right of offset), Tenant shall have the right to offset the amount due, together with interest thereon at the Interest Rate (as defined in Section 46) from the date of Landlord's receipt of the above billing, from one or more installments of Rent due to Landlord until Tenant is fully reimbursed.

14. <u>Signs</u>. Tenant may, at its own expense, place, erect and maintain exterior signs on the walls or any other place on or about the Premises subject to the prior consent of Landlord, which shall not be unreasonably withheld or delayed. Tenant shall be permitted to install appropriate signs, its logo, etc., on the walls of the Building first floor lobby elevator bank, on the walls of elevator lobbies on floors on which the Premises are located and on entrance doors to the Premises. Tenant shall have the right to approve all other signs on, within and adjacent to the Building, which approval shall not be unreasonably withheld, conditioned or delayed, except that Tenant shall have no right to approve any signage for 24 Hour Fitness (or its successor or assignee as the tenant under 24 Hour Fitness' lease, as it may be extended or renewed), or for any health club user that may lease premises in the Building.

The initial cost of installation of Tenant's signs depicted on <u>Exhibit F</u> shall be included as part of Landlord's Work (as defined in <u>Exhibit C</u>). Maintenance, repair, restoration and removal of such signs shall be included in the Building's Occupancy Costs. Landlord will maintain all Tenant's signage in Common Areas of the Project and on the exterior of the Building in reasonably good condition and repair. Landlord agrees to cooperate with Tenant in procuring any necessary permits needed to allow the erection of Tenant's signs.

Landlord shall furnish Tenant with space on any sign for the Project, office directories and similar facilities. Tenant shall receive an equitable portion of the available space and prominence on such facilities based on the relative size of Tenant's Premises to the Building Square Footage. There shall be no minimum occupancy requirements related to Tenant's sign rights. All Tenant's sign rights shall be transferable in whole or in part by Tenant to a successor and/or permitted sublessee or assignee.

Landlord shall not grant sign rights on the Project to any competitor of Tenant.

I-609991.5
11/16/2004
13771.03

15.    Damage or Destruction.

(a)    If all or any part of the Building shall be destroyed or damaged by fire or other casualty required to be insured against under this Lease, then Landlord shall, as promptly as feasible, repair such damage and restore the Premises and/or the Building, as the case may be, as nearly as possible to the condition that existed immediately prior to the occurrence of such casualty. If the damage or destruction occurs during the last two (2) years of the Initial Term or during any Renewal Term, and the restoration of the Premises cannot be diligently completed within a six (6) month period after the date of the damage or destruction, then either party may terminate this Lease by giving the other party notice of termination. Such termination shall be effective twenty (20) days following receipt of the notice by the other party, except that a notice of termination by Landlord shall be of no force or effect if within twenty (20) days after receipt of such notice Tenant gives written notice ("Nullification Notice") to Landlord of Tenant's exercise of any available renewal option. In addition, if Landlord fails to commence restoration within forty-five (45) days after the date of the damage or destruction and thereafter diligently prosecute the same to completion, or if Landlord fails to complete such restoration within six (6) months after the date of damage or destruction, Tenant shall have the option to terminate this Lease by giving written notice to Landlord at any time prior to the commencement or completion of restoration, as applicable. If this Lease is not terminated or if Landlord's termination is nullified by a Nullification Notice, Landlord shall be obligated to restore the Premises and/or the Building as provided above. If this Lease is terminated, all insurance proceeds for the Premises and other improvements payable under Landlord's policies and derived from such damage or destruction shall be paid solely to Landlord, and all Rent (including all Additional Rent) shall abate and be prorated as of the date of the damage or destruction (with any surplus rent paid in advance being refunded to Tenant).

(b)    If Tenant is deprived of the use of all or any portion of the Premises by reason of any such damage or casualty or the repair thereof, the Rent (including all Additional Rent) shall be abated in proportion to the portion of the Premises rendered untenantable from the date of the casualty until the Premises has been restored and rendered tenantable. In the event that such damage precludes Tenant from conducting its usual business in the Premises (in Tenant's reasonable judgment) or renders the entire Premises untenantable, Rent shall completely abate until such time as the Premises are restored and rendered tenantable.

16.    Repairs.

(a)    Landlord shall make all necessary repairs, maintenance or replacements to the Building and the Premises arising from faulty material used or defective workmanship employed in the construction of the Building or Landlord's work in the Premises.

(b)    Landlord shall keep in good condition and repair and shall make all repairs, maintenance or replacements to (i) the Building systems, including without limitation elevators, heating, air-conditioning and other utilities serving the Premises; (ii) the exterior and the structural portions of the Premises and Building, including without limitation the roof and roof supports, flashings, gutters, down spouts, footings, foundations, structural supports,

I-609991.5
11/16/2004
13771.03

columns, exterior walls, load bearing walls, retaining walls, floors and chimneys and (iii) all Common Areas as provided in Section 11 above.

    (c)    Tenant shall maintain and repair in good condition the non-structural portions of the interior of the Premises subject to Landlord's obligations pursuant to this Section and other express provisions of this Lease.

    17.    Entry. Landlord shall have the right to enter the Premises at all reasonable hours to examine the same as well as for maintenance purposes. Landlord shall, in connection with the performance of any such work, use its best efforts to minimize the inconvenience, annoyance or disturbance caused to Tenant during such work and shall schedule such work outside of regular business hours if reasonably possible. During the last four months of the Term, upon advance oral notice, Landlord shall have the right to enter the Premises at reasonable hours to exhibit the same for rental. Landlord may also enter the Premises at reasonable times upon advance oral notice to Tenant to show the Premises to prospective purchasers and lenders. Tenant may designate certain areas of the Premises as "Secured Areas" should Tenant require such areas for the purposes of securing certain valuable property or confidential information. Landlord may not enter any Secured Area except in the case of emergency or in the event of a Landlord inspection, in which case Landlord shall provide sufficient advance notice as determined by Tenant.

    18.    Condemnation.

    (a)    In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Project, which involves a taking of ten percent (10%) or more of the Premises, Tenant may terminate this Lease by giving notice to Landlord not more than thirty (30) days after the later of the date on which title vests in the condemning authority or the date when Tenant receives notice of such vesting.

    (b)    In the event that this Lease is not terminated as a result of any such Taking, Landlord shall promptly restore the Premises to a condition reasonably equivalent to that existing prior to such Taking and shall apply the "Award" (as defined below) to the cost of such restoration. In such event, the rent payable by Tenant under this Lease shall be equitably abated and appropriately rebated based on the effect of the Taking on the rental value of the Premises and Tenant's business operations at the Premises.

    (c)    In the event of a Taking pursuant to the provisions of this Lease, Landlord and Tenant agree that Tenant shall have no claims or rights in any award arising from or related to or proceeds of such Taking (collectively the "Award"), except that Tenant may apply for and receive an award separate from the Award to Landlord for the taking of Tenant's trade fixtures and for Tenant's moving expenses.

    (d)    If this Lease is terminated as the result of a taking, Landlord shall promptly refund to Tenant all unearned Base Rent and other Rent amounts paid in advance by Tenant.

1-609991.5
11/16/2004
13771.03

19.    Tenant's Default; Landlord's Remedies; General Default Provisions.

(a)    Defaults. The occurrence of any one or more of the following events ("Defaults") shall constitute a default and breach of this Lease:

(i)    Tenant shall fail to pay the Base Rent, additional rent or other charges under this Lease when due and such failure shall continue for ten (10) days after Tenant's receipt of written notice from Landlord; or

(ii)    Tenant shall neglect or fail to perform or observe any other covenant set forth in this Lease on Tenant's part to be performed or observed and Tenant shall fail to remedy the same within thirty (30) days after receipt of written notice specifying such neglect or failure, or if such failure is of such a nature that Tenant cannot reasonably remedy the same within such thirty (30) day period, Tenant shall fail to commence to remedy the same within such thirty (30) days period and to prosecute such remedy to completion with reasonable diligence.

(b)    Remedies. Upon the occurrence and continuance of a Default, Landlord may do any one or more of the following: (i) re-enter the Premises without terminating this Lease upon fifteen (15) days' prior written notice to Tenant and remove all persons and property from the Premises, by any suitable action or proceeding at law, and repossess and enjoy the Premises; (ii) terminate this Lease upon not less than fifteen (15) days' written notice to Tenant, at which time the Term of this Lease shall expire, but with Tenant's liability as set forth below in this Section 19 to continue; (iii) employ the remedy described in California Civil Code Section 1951.4 (Landlord may continue this Lease in effect after Tenant's breach and abandonment and recover Rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations); or (iv) exercise any other legal or equitable rights or remedies available to Landlord, including those additional rights set forth in this Lease.

If Landlord re-enters the Premises as provided in item (i) above or takes possession of the Premises pursuant to legal proceedings or otherwise in accordance with applicable law, then, if Landlord does not elect to terminate this Lease, Landlord agrees to use reasonable efforts to re-let the Premises, in one or more leases, either in Landlord's own right or as agent for Tenant, for a term or terms that may be greater or less than the balance of the Term of this Lease, and Landlord may grant reasonable concessions or reasonable free rent without in any way affecting Tenant's liability for the Rent payable under this Lease. Tenant's liability under this Lease shall not be affected or diminished in any way whatsoever for Landlord's failure (after using reasonable efforts) to re-let the Premises, or if the Premises are re-let, for Landlord's failure (absent bad faith) to collect the rentals under such re-letting. In connection with any re-letting, Landlord may make or do any alterations, maintenance, repairs, painting and/or decorations (collectively "Re-letting Preparations") in the Premises that are advisable and necessary in Landlord's reasonable business discretion, and such Re-letting Preparations shall not release Tenant from any liability under this Lease.

(c)    Damages. If a Default occurs, Landlord may recover from Tenant the following:

17

(i)    The worth at the time of award of the unpaid rent and charges equivalent to rent earned as of the date of the termination hereof;

(ii)    The worth at the time of award of the amount by which the unpaid rent and charges equivalent to rent which would have been earned after the date of termination hereof until the time of award exceeds the amount of such rental loss that Tenant provides could have been reasonably avoided;

(iii)    The worth at the time of award of the amount by which the unpaid rent and charges equivalent to rent for the balance of the term hereof after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

(iv)    Any other amount necessary to compensate Landlord for removal (including the repair of any damage caused by such removal) and storage (or disposal) of Tenant's personal property, equipment, fixtures, and any other items which Tenant is required under this Lease to remove but does not remove; and

(v)    Any other amount which Landlord may hereafter be permitted to recover from Tenant to compensate Landlord for the detriment caused by Tenant's default.

For the purpose of this Section, the "time of award" shall mean the date upon which the judgment in any action brought by Landlord against Tenant by reason of such default is entered or such earlier date as the court may determine; the "worth at the time of award" of the amounts referred to in Sections 19(c)(i) and 19(c)(ii) shall be computed by allowing interest at the Interest Rate, but not greater than the legal rate; and the "worth at the time of award" of the amount referred to in Section 19(c)(iii) shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%) per annum. Tenant agrees that such charges shall be recoverable by Landlord under California Code of Civil Procedure Section 1174(b) or any similar, successor or related provision of law. Tenant hereby waives the provisions of California Code of Civil Procedure Section 1174(c) and California Civil Code Section 1951.7 or any other similar, successor or related provision of law providing for Tenant's right to satisfy any judgment in order to prevent a forfeiture of this Lease or requiring Landlord to deliver written notice to Tenant of any reletting of the Premises.

(d)    Attorney's Fees and Expenses. If Landlord and Tenant are involved in any litigation regarding the performance of their obligations under this Lease, then in addition to all other rights and remedies the parties may have under this Lease, the unsuccessful party by final order, decree or judgment in such litigation by a court of competent jurisdiction shall reimburse the successful party for all reasonable legal fees and expenses incurred by such successful party in connection with such litigation.

(e)    Remedies Cumulative. Each remedy provided for in this Lease for both Landlord and Tenant shall be cumulative and concurrent and shall be in addition to every other remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute; provided, however, that, except as otherwise expressly provided in this Lease, neither party shall have the right to receive consequential, speculative, punitive, or other similar measures of

18

damages. The exercise of any remedies shall not preclude the simultaneous or later exercise of the same or any other remedies.

20.    Landlord's Default; Tenant's Remedies. If during the Term of this Lease Landlord fails to comply with any of the terms, conditions or provisions of this Lease, and Landlord does not cure such failure within thirty (30) days after receipt of written notice from Tenant, or if such failure cannot reasonably be cured within the applicable cure period and Landlord does not immediately and in good faith commence to cure such failure and diligently proceed to complete such cure, then if Landlord again fails to commence performance of its obligations within three (3) business days after Tenant gives Landlord a reminder notice (which reminder notice will specifically reference this Section 20 and Tenant's right of self-help), Tenant shall have the right, at Tenant's option, to cure such default or perform such covenant or obligation on the part of Landlord, and Landlord shall be liable for all reasonable out-of-pocket costs and expenses so incurred by Tenant.

Notwithstanding the foregoing provisions, in the event of an emergency when action is required to be taken forthwith to avoid personal injury or damage to the Premises or to Tenant's equipment and other personal property, Tenant may take curative action as contemplated under this Section even though the applicable cure period (which applies when an emergency does not exist) of the Landlord has not yet expired. Tenant shall endeavor to give Landlord such prior notice (written or oral), if any, as may be reasonable under the circumstances and shall in any event notify Landlord as soon as possible after taking curative action. Except under the circumstances set forth in this Article 20, Tenant waives the right to make repairs at Landlord's expense under any law, statute or ordinance now or hereafter in effect (including the provisions of California Civil Code Section 1942 and any successive sections or statutes of a similar nature).

If Landlord fails to reimburse Tenant for all such amounts expended within twenty (20) days after receipt of a billing therefor, Tenant may deduct such amounts, together with interest thereon at the Interest Rate (as defined in Section 46) from the date of Landlord's receipt of the above billing, from one or more installments of Rent due to Landlord until Tenant is fully reimbursed.

Tenant agrees that its right of self-help shall be carefully and judiciously exercised, it being understood and agreed that, whenever possible, Landlord shall be given sufficient opportunity to perform its obligations, in order to avoid any conflict with respect to whether or not self-help action should have been taken.

21.    Rules and Regulations. Tenant shall at all times abide by and observe the Rules and Regulations attached to this Lease as Exhibit E.

22.    Assignment and Subletting.

(a)    Consent Required. Tenant shall not assign this Lease or sublet the Premises or any part thereof (collectively such events are referred to as "Transfers") without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. In the event of any Transfer permitted under the terms of this

19

Section, Tenant shall remain fully and primarily liable for all of the obligations of Tenant under this Lease. Consent by Landlord to any one Transfer shall not be deemed to waive the requirement that Landlord's consent be obtained for future Transfers. In determining whether to grant such consent, Landlord may consider the following: (a) business criteria relating to the proposed transferee's background, experience, reputation, general operating ability and ability to perform Lease obligations, and potential for succeeding in its business, (b) financial criteria relating to the proposed transferee's financial responsibility, credit rating and capitalization, (c) the identity and personal characteristics of the proposed transferee and its invitees and guests, and (d) the nature of the proposed use and business of the proposed transferee and its effect on the tenant mix of the Building. Without limitation as to other reasonable grounds for withholding consent, the parties hereby agree that it shall be reasonable under this Lease and under any applicable law for Landlord to withhold consent to any proposed Transfer if any of the following situations exist or may exist: (a) the business reputation or character of the proposed transferee is not reasonably acceptable to Landlord; (b) Tenant is in default beyond any applicable notice and cure period; and (c) if the transferee proposes to use the Premises for other than a career/technical/vocational school, the proposed use by the transferee would result in a breach by Landlord of any then-existing exclusive right in favor of any other tenant of the building or any covenants, conditions and restrictions of record. Landlord shall notify Tenant of any then-existing exclusive right and any covenants, conditions and/or restrictions of record within ten (10) days after Tenant submits a written request therefor. Hypothecation and encumbering of any of Tenant's interest herein is prohibited. Whenever Landlord's consent is necessary under the terms of this Section, the party requesting such consent shall submit the following information relating to the proposed Transfer and the parties involved therein along with a written request for Landlord's consent to the proposed Transfer: (i) all Transfer and related documents, (ii) financial statements, (iii) business, credit and personal references and history, and (iv) such other information as Landlord may reasonably request. Any assignment, sublease or Transfer which does not comply with the provisions of this section shall be voidable at the option of Landlord and shall constitute a breach of and default under this Lease by Tenant. Tenant shall reimburse Landlord for Landlord's reasonable costs and expenses (including, but not limited to, reasonable attorneys', accountants', architects', engineers', and consultants' fees) incurred in connection with the processing and documentation of any requested assignment, sublease or other Transfer, not to exceed $1,500.00.

(b)   No Release or Waiver. No assignment, sublease or other Transfer, even with the consent of Landlord, shall result in Tenant's being released from any of its obligations hereunder. Landlord's acceptance of rent directly from any assignee, subtenant or any other transferee shall not be construed as Landlord's consent thereto nor Landlord's agreement to accept the attornment of any subtenant in the event of any termination of this Lease. In no event shall Landlord's enforcement of any provision of this Lease against any transferee be deemed a waiver of Landlord's right to enforce any term of this Lease against Tenant or any other person. If Tenant's obligations hereunder have been guaranteed, Landlord's consent to any assignment, sublease or other Transfer shall not be effective unless the guarantor also consents to such transaction.

(c)   Transfers Subordinate. Any Transfer shall be subordinate and subject to the provisions of this Lease, and if this Lease shall be terminated during the term of any such

20

Transfer, such Transfer shall be voidable by Landlord and Landlord shall have the right in its sole discretion to: (i) treat such Transfer as canceled and repossess the space subject to such Transfer by any lawful means, or (ii) require that the transferee attorn to and recognize Landlord as its landlord under such Transfer or such other terms as Landlord requires.

(d)     Landlord Consent Not Required. Notwithstanding any other provision of this Lease to the contrary, Tenant may assign this Lease or sublet the Premises without Landlord's consent to any corporation which controls, is controlled by or is under common control with Tenant, or to any corporation resulting from a merger, acquisition, consolidation, reorganization or name change of or with Tenant, or in connection with the sale of all or substantially all of the assets of Tenant (each, an "Approved Transferee").

23.    Subordination, Non-Disturbance and Attornment.

(a)     Subject to the provisions of subsection (b) below, (i) this Lease and all rights of the Tenant are, and shall be subject and subordinate to the lien of any first mortgage, deed of trust or any other security interest which have been or which hereinafter may affect the Premises, and to all renewals, modifications, consolidations, replacements and extensions thereof; (ii) Tenant agrees to attorn to any successor to Landlord's interest in the Premises, or to any purchaser at foreclosure (or by deed in lieu of foreclosure) upon all of the terms and conditions of this Lease; and (iii) Tenant covenants and agrees that it shall, within fifteen (15) business days after Landlord's request therefor, execute and deliver such agreements confirming the above subordination and attornment as are reasonably requested by Landlord or Landlord's lender.

(b)     Before any subordination and/or attornment by Tenant shall be effective, Landlord shall cause any mortgagee, holder of a deed of trust or security interest, or ground or underlying lessor (collectively the "Mortgagee") to deliver to Tenant a non-disturbance agreement stating that so long as Tenant is not in default under this Lease beyond any applicable cure periods, (i) any action or proceeding to foreclose any mortgage, deed of trust or security interest will not result in any disturbance of Tenant's possession of the Premises, and (ii) Tenant's rights under this Lease shall not be interfered with or otherwise affected.

(c)     Within thirty (30) days after the mutual execution of this Lease, Landlord shall cause any existing Mortgagee to deliver a non-disturbance agreement complying with the provisions of this Section 23 to Tenant with respect to this Lease.

24.    Estoppel Certificate. Within fifteen (15) business days after receipt of a request, Landlord and Tenant each agree to deliver to the other party a duly executed and acknowledged instrument certifying to the party's best knowledge (i) whether this Lease is in full force and effect (and if not, why), (ii) as to the existence of any default, including the nature or extent of such default, (iii) whether there are any defenses, counterclaims or offsets to such default, (iv) whether there has been any modification or amendment to this Lease and specifying the nature of such modification, (v) as to the commencement and expiration dates of the Term, (vi) as to the date to which Rent has been paid, and (vii) as to such other matters relating to this Lease as may be reasonably requested. Any such certificate may be conclusively relied upon by the requesting

21

party and by any other person to whom it has been exhibited or delivered, and the contents of the certificate shall be binding upon the party executing such certificate.

25.    Short Form Memorandum of Lease.  This Lease shall not be recorded; however, at the written request of either party, a short form Memorandum of Lease in the form attached hereto as Exhibit G shall be entered into by Landlord and Tenant following the execution of this Lease. The cost of recording such Memorandum of Lease shall be at the expense of the party that requests such recording. If a Memorandum of Lease is recorded, the parties agree at the expiration or earlier termination of this Lease to execute a Notice of Termination of this Lease in recordable form.

26.    Force Majeure.  In the event that Landlord or Tenant shall be delayed, or hindered, or prevented from the performance of any act required under this Lease (except for the payment of Rent or other monies), by reason of governmental restrictions, scarcity of labor or materials, or for other reasonable reasons beyond such party's control, the performance of such act shall be excused for the period of delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

27.    Landlord's Authority.  Landlord warrants that it is the owner of the Building and has the full right and authority to make this Lease. Landlord represents and warrants that the individual(s) executing this Lease on behalf of Landlord is duly authorized to execute and deliver this Lease; that Landlord is a duly organized limited liability company under the laws of the state of California, in good standing under the laws of California and with the power and authority to enter into this Lease; and that all action requisite to authorize Landlord to enter into this Lease has been duly taken.

28.    Tenant's Authority.  Tenant represents and warrants that the individual(s) executing this Lease on behalf of Tenant is duly authorized to execute and deliver this Lease; that Tenant is a duly organized corporation under the laws of the State of Nevada, in good standing under the laws of Nevada, and with the power and authority to enter into this Lease; and that all corporate action requisite to authorize Tenant to enter into this Lease has been duly taken.

29.    Broker's Commission.  Both Landlord and Tenant agree that this Lease was procured by the Broker and that the Broker was the only broker dealt with by the parties in this transaction. Landlord agrees to pay the brokerage commission owed to Broker in connection with this Lease. Each party agrees to indemnify and hold the other party harmless from any costs, liabilities, and commissions arising out of the dealings by the indemnifying party with any broker in connection with this Lease or the Building or Premises, other than the commission owed to Broker as noted above.

30.    Exculpation.  It is specifically understood and agreed by the parties hereto that there shall be no personal liability of Landlord, its partners, members, property manager and their respective partners, members, officers, agents, servants, employees, and independent contractors (collectively, "Landlord Parties") with respect to any of the covenants, conditions and provisions of this Lease, and that in the event of a breach or default by Landlord of any of its duties or obligations under this Lease, Tenant shall look to the equity interest of Landlord in the Project, plus insurance and condemnation proceeds, future rents and the proceeds of a sale

I-609991.5
11/16/2004
13771.03

received upon execution of any judgment, decree, order of levy thereon against Landlord's
equity interest in the Project. However, none of the foregoing provisions and limitations shall be
deemed to preclude the Tenant from pursuing and obtaining equitable remedies, such as
injunctive relief or specific performance, or from pursuing any other rights Tenant may have
against Landlord by virtue of this Lease, including without limitation, all rights of self-help and
the right to deduct any amounts expended in connection therewith from Rent as set forth in this
Lease or otherwise allowed by applicable law.

31.    Surrender; Holdover. Upon expiration or termination of this Lease, Tenant agrees
to surrender the Premises and all equipment of Landlord in good and clean condition, ordinary
wear and tear and damage caused by insurable casualty and causes beyond the control of Tenant
excepted. Any holdover by Tenant beyond the end of the Term shall constitute a tenancy from
month-to-month that either party may cancel upon thirty (30) days' notice to the other party.
The foregoing notwithstanding, provided that Tenant is not then in default under this Lease and
Tenant gives Landlord at least six (6) months prior written notice (i.e., at least six (6) months
prior to the expiration of the initial or any Renewal Term), Tenant shall have the right to
holdover in the Premises for up to six (6) months after the expiration or sooner termination of the
Term of this Lease (the "Approved Holdover Period"). The Approved Holdover Period shall be
upon the same terms and conditions set forth in this lease except that Base Rent shall be one
hundred ten percent (110%) of the rate in effect during the last calendar month prior to the
Approved Holdover Period. In the event that Tenant desires to terminate the Approved Holdover
Period on or before the expiration thereof, Tenant may do so by giving Landlord no less than
three (3) months' prior written notice (in which case, this Lease shall terminate on the date so
specified by Tenant). If Tenant remains in possession of the Premises or any part thereof after
the expiration of the Term hereof (or after the Approved Holdover Period, if applicable) without
the express written consent of Landlord, such occupancy shall be a tenancy at sufferance at a
rental rate equal to 125% of the last monthly rental plus all other charges payable hereunder, and
upon all the terms hereof. Notwithstanding the foregoing provisions, if Landlord provides
Tenant with at least sixty (60) days prior written notice that Landlord has a signed proposal or
lease from a succeeding tenant to lease the Premises, and if Tenant fails to surrender the
Premises upon the later of (i) the date of expiration of such sixty (60) day period, or (ii) the date
of expiration or termination of this Lease or the Approved Holdover Period, as applicable,
Tenant agrees to indemnify, defend and hold Landlord harmless from all costs, loss, expense or
liability, including without limitation, claims made by any succeeding tenant and reasonable
attorney's fees and costs.

32.    Notices. Any notice by either party to the other shall be in writing and shall be
deemed to be duly given only if delivered personally or delivered by recognized overnight
courier service, such as Federal Express, or mailed by registered or certified mail, return receipt
requested, in a post-paid envelope addressed (a) if to Tenant, at Tenant's Notice Address; and (b)
if to Landlord, at Landlord's Notice Address, or to either at such other addresses as Tenant or
Landlord, respectively, may designate in writing. Notice shall be deemed to have been duly
given upon delivery thereof. Notices may also be given by facsimile transmittal (i.e., telecopy or
"fax") during business hours on any business day and shall be effective upon receipt, provided a
copy of such notice is sent on the same business day as such facsimile transmittal by Federal
Express or other reputable overnight courier service as provided above.

23

33.    Successors and Assigns. This Lease shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns.

34.    Covenant of Quiet Enjoyment. Provided that Tenant is not in default under this Lease beyond applicable cure periods, Tenant shall, during the term hereby created, freely, peaceably and quietly occupy and enjoy the full possession of the Premises without molestation or hindrance by any party.

35.    Relationship of Parties. It is expressly understood that Landlord shall not be construed or held to be partner or associate of Tenant in the conduct of Tenant's business, it being expressly understood that the relationship between the parties is that of Landlord and Tenant only.

36.    Section Headings. The Section headings throughout this Lease are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify or amplify or aid in the interpretation, construction or meaning of the provisions of this Lease.

37.    Complete Agreement. This Lease contains the entire agreement between Landlord and Tenant and all previous negotiations leading thereto, and this Lease may be modified only by an agreement in writing signed by both parties. The parties agree that the execution of this Lease has not been induced by either party by any representations, promises or undertakings not expressed in this Lease.

38.    Waiver. The failure of either party to insist upon a strict performance of any of the terms, conditions and covenants of this Lease shall not be deemed a waiver of any other then existing or subsequent breach or default, except for any breach or default that a party expressly waives in writing. Any monetary amounts (excluding Base Rent), not billed within one (1) year of the original due date therefor shall be waived in their entirety.

39.    Jurisdiction. This Lease shall be governed by the laws of the state where the Project is located.

40.    Counterparts. This Lease may be executed in counterparts, each of which shall be deemed to be an original, and/or with counterpart signature pages, all of which shall be treated collectively as representing the single execution of this Lease.

41.    Exhibits. The following Exhibits are attached to this Lease.

| A | - | Site Plan |
| A-1 | - | Legal Description |
| B | - | Floor Plan |
| C | - | Landlord's Work |

24

D   -   Base Rent Adjustment

E   -   Rules and Regulations

F   -   Signage

G   -   Form of Memorandum of Lease

H   -   HVAC Specifications

42.    Exclusive. Landlord covenants and agrees that Tenant shall have the exclusive right to operate a vocational school/college, career school/college or other educational facility at the Project, and Landlord covenants and agrees that it will not sell, lease or otherwise allow the use of any other portion of the Project for such purposes.

43.    Rights Reserved to Landlord. Landlord reserves the following rights, exercisable without notice, except as provided herein, and without liability to Tenant for damage or injury to property, person or business and without affecting an eviction or disturbance of Tenant's use or possession or giving rise to any claim for setoff or abatement of rent or affecting any of Tenant's obligations under this Lease: (1) to change the name or street address of the Project; (2) to make any decorations, alterations, additions, improvements to the Project, or any part thereof which Landlord shall desire, or deem necessary for the safety, protection, preservation or improvement of the Project, or as Landlord may be required to do by law; (3) subject to Section 17, to retain at all times and to use in appropriate instances, pass keys to all locks within and to the Premises; and (4) to restrict or prohibit access to the Premises or the Project at any time Landlord determines it is necessary to do so to minimize the risk of injuries or death to persons or damage to property.

44.    Sale by Landlord. If Landlord sells or transfers all or any portion of the Project, including the Premises, Landlord shall, upon consummation of such sale or transfer and the assumption (by operation of law or otherwise) by the purchaser of all obligations thereafter to be performed or observed under this Lease, be released from any liability relating to obligations or covenants thereafter to be performed or observed under this Lease, and in such event Tenant agrees to look solely to Landlord's successor in interest with respect to any such liability. Landlord may transfer or credit any security deposit or prepaid rent to Landlord's successor in interest, and upon such transfer Landlord shall be discharged from any further liability therefor.

45.    Taxes Payable by Tenant. Tenant shall pay before delinquency all taxes, assessments, license fees and other charges (collectively, "taxes") that are levied and assessed against Tenant's trade fixtures and other personal property installed or located in or on the Premises, and that become payable during the term. On written demand by Landlord, Tenant shall furnish Landlord with satisfactory evidence of such payments.

46.    Interest and Service Charges. Any amount not paid by Tenant to Landlord when due hereunder shall bear interest at a rate (the "Interest Rate") equal to the lesser of (a) the prime rate announced by The Chase Manhattan Bank, N.A. or, if such bank fails to announce such a rate, the "prime rate" publicly quoted by the Los Angeles office of the largest bank (in terms of

25

gross assets) in the State of California having such an office, plus two (2) percentage points, or (b) the maximum rate permitted by law, from the due date until paid, unless otherwise specifically provided herein, but the payment of such interest shall not excuse or cure any such failure by Tenant under this Lease. Notwithstanding the foregoing, Tenant shall not incur an interest charge on the first delinquent rent payment in any calendar year unless Tenant fails to pay the delinquent amount within ten (10) days of Tenant's receipt of written notice from Landlord that the amount is delinquent. In addition to such interest, if any amount is not paid within ten (10) days after Tenant's receipt of written notice that the same was not paid when due, a service charge equal to two percent (2%) of such amount shall be assessed, which service charge Tenant hereby agrees is a reasonable estimate of the damages Landlord shall suffer as a result of Tenant's late payment, which damages include Landlord's additional administrative and other costs associated with such late payment. The parties agree that it would be impracticable and extremely difficult to fix Landlord's actual damages in such event. Such interest and service charges are separate and cumulative and are in addition to and shall not diminish or represent a substitute for any or all of Landlord's right or remedies under any other provision of this Lease.

47.    Waiver of Jury Trial. Landlord and Tenant shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and any statutory remedy.

48.    No Merger. Any voluntary or other surrender of this Lease by Tenant, mutual termination hereof or termination hereof by Landlord shall not work a merger, and shall, at the option of Landlord, terminate all or any existing subleases or subtenancies, or may, at the option of Landlord, operate as an assignment to Landlord of any or all such subleases or subtenancies. No act or omission of Landlord or any representative thereof shall be deemed to constitute acceptance of any surrender, and no surrender shall be deemed to have occurred, unless in a writing executed by Landlord and approved in writing by the mortgagee under any first mortgage or the beneficiary under any first deed of trust, as the case may be, encumbering the Building.

49.    Partial Invalidity. Any provision of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof, and such other provisions shall remain in full force and effect and shall be valid and enforceable to the fullest extent permitted by law.

50.    No Landlord Security Obligations. Tenant hereby acknowledges that Landlord shall have no obligation to provide guard service or other security measures for the benefit of the Premises, the Building or the Project. Tenant hereby assumes all responsibility for the protection of Tenant and its employees, agents, contractors, representatives, licensees, guests, invitees and visitors, and the property thereof, from acts of third parties whether or not Landlord, at its option, elects to provide any security protection for the Project or any portion thereof.

51.    Light and Air. No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease.

26

52.     Portions of the Premises Reserved to Landlord.  Tenant hereby acknowledges and agrees that the exterior walls of the Building and the area between the finished ceilings of the Premises and the slab of the floor of the Building thereabove have not been demised hereby, and that the use thereof, together with the right to install, maintain, use, repair and replace pipes, ducts, conduits and wires leading through, under or above the Premises, is hereby excepted and reserved unto Landlord, except that Tenant shall have the right to install, maintain use, repair and replace pipes, ducts, conduits and wires therein for purposes of facilities serving the Premises exclusively.

53.     Cleaning.  The Premises shall be thoroughly cleaned, at Landlord's sole cost and expense, prior to and immediately following Tenant's move into the Premises.

54.     Lease Addendum.  A Lease Addendum consisting of Sections 55 through 57 of this Lease is attached to this Lease and the provisions thereof are fully incorporated into this Lease.

[Signature pages follow]

WITNESS the following signatures:

LANDLORD:                    240 NORTH BRAND ASSOCIATES, LLC
                             a California limited liability company


                             By _____
                                 Name: _____
                                 Title: _____


TENANT:                      GLENDALE CAREER SCHOOLS, INC.
                             a Nevada corporation


                             By _____
                                 Name: _____
                                 Title: _____

I-609991.5
11/16/2004
13771.03

LEASE ADDENDUM

The following provisions are incorporated into a certain Lease dated November 2, 2004, between 240 NORTH BRAND ASSOCIATES, LLC, a California limited liability company , as Landlord, and GLENDALE CAREER SCHOOLS, INC., a Nevada corporation, as Tenant:

55.    Communications Equipment. Tenant shall have the nonexclusive right to install satellite dishes and/or other antennae, and/or other facilities for telecommunications ("Communications Equipment") on, and affix Communications Equipment to, the roof of the Building. In the event Tenant installs Communications Equipment, Tenant shall do so at its sole cost and expense, and Tenant shall obtain, at its sole cost and expense, any and all permits, authorizations and certificates, including, without limitation, zoning variances or changes, as may be required with respect to such Communications Equipment from all governmental agencies (provided that Landlord agrees to reasonably cooperate with Tenant to obtain same if required by applicable governmental agencies) and shall provide copies of such permits to Landlord upon request. Tenant's right to install Communications Equipment is subject to the following: (i) the installation shall be performed by a licensed contractor who is experienced in the installation of such equipment; (ii) Tenant shall be responsible for all costs of repairs and improvements, including, without limitation, any patching or strengthening of the roof of the building, which may be necessary on account of, or be necessary for, the installation of the Communications Equipment; and (iii) the Communications Equipment shall be installed pursuant to plans and specifications approved by Landlord, which approval shall not be unreasonably withheld or delayed.

56.    Telecommunications. Tenant may contract with any telecommunications provider of its choice. Landlord shall provide Tenant's telecommunications providers access to the Building riser and rooftop for purposes of installing cabling and equipment.

57.    Hazardous Materials.

(a)    Definition of Hazardous Materials. For purposes of this Lease, the term "Hazardous Materials" shall mean any hazardous, toxic, or dangerous substance or material, or any substance or material defined as such in (or for purposes of) the Comprehensive Environmental Response, Compensation and Liability Act, any so-called "super fund" or "super lien" law, or any other federal, state, or local statute, law, ordinance, code, regulation, order, or other requirement of any governmental authority having jurisdiction over the Project regulating, relating to, or imposing liability for, or any standard of conduct concerning, any hazardous, toxic, or dangerous waste, substance, or material, as now or at any time hereafter in effect (collectively, "Environmental Laws"). Without limiting the generality of the foregoing, Hazardous Materials shall be deemed to include "Medical Waste" (as defined below), asbestos (in any form or condition), petroleum, crude oil, natural gas, natural gas liquids and/or polychlorinated biphenyls.

(b)    Use of Hazardous Materials. Tenant shall not cause or permit any Hazardous Materials to be brought upon, stored, used or disposed on the Premises; provided, however, that Tenant shall have the right to utilize standard cleaning and other materials which are typically used in the operation of businesses similar to Tenant's, provided that Tenant shall

1

comply with all Environmental Laws pertaining to the use, storage and disposal of such materials. Landlord acknowledges that Tenant produces blood and other medical waste (collectively, "Medical Waste") as part of its educational operations at the Premises and agrees that Tenant may produce such Medical Waste at the Premises provided that Tenant complies with the provisions of this Section 57. Tenant agrees to separately collect and dispose of such Medical Waste at Tenant's sole cost and expense and in compliance with all applicable Environmental Laws.

(c)    Indemnifications. Tenant hereby agrees to indemnify, protect, defend and hold harmless Landlord from and against any and all liabilities, losses, damages, judgments, fines, demands, claims, costs and expenses (including, but not limited to, reasonable attorneys' fees and court costs) arising out of or related to the use, generation, storage, treatment, disposal or transportation of Hazardous Materials brought onto the Premises or Project by Tenant or its contractors or employees or any of its subtenants or licensees. Landlord hereby agrees to indemnify, protect, defend and hold harmless Tenant from and against any and all liabilities, losses, damages, judgments, fines, demands, claims, costs and expenses (including, but not limited to, reasonable attorneys' fees and court costs) arising out of or related to the presence, use, generation, storage, treatment, disposal, or transportation of Hazardous Materials in, onto or about the Premises or Project, except to the extent such Hazardous Materials are brought onto the Premises or Project by Tenant or its employees. Landlord further agrees that if the removal or abatement of any Hazardous Materials is required by Environmental Law, then, except if such Hazardous Materials was brought onto the Premises or Project by Tenant or its employees or contractors, Landlord shall at its sole cost and expense remove all such Hazardous Materials from the Premises and Project.



EXHIBIT - A

EXHIBIT A-1

## LEGAL DESCRIPTION

Lots 23 and 24 and those portions of Lots 1 and 2 lying Westerly of a line parallel with and distant Easterly 200 feet from the Westerly lines of Lots 23 and 24, all in Block 5 of Glendale Boulevard tract, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 5 Page 167 of Maps, in the Office of the County Recorder of said County.

1-613757.1
11/16/2004
13770.06

EXHIBIT B

FLOOR PLAN OF PREMISES

**EXHIBIT B**
(page 1 of 2)



"Exhibit B represents the location and dimensions of the Premises. The layout of the tenant improvements to be constructed in accordance with Exhibit "C" will be based upon revised space plans to be submitted by Tenant as soon as possible following Lease execution."

B-1

**EXHIBIT B**
(page 2 of 2)



"Exhibit B represents the location and dimensions of the Premises. The layout of the tenant improvements to be constructed in accordance with Exhibit "C" will be based upon revised space plans to be submitted by Tenant as soon as possible following Lease execution."

B-2

EXHIBIT C

LANDLORD'S WORK

1.    Landlord's Work. Landlord agrees to fulfill all of Landlord's construction obligations (collectively "Landlord's Work") at its sole cost and expense and in accordance with the Final Plans and Specifications (as defined below), which work shall include, without limitation, the work so designated on the guideline plans and specifications to be delivered by Tenant to Landlord as provided below, as well as the following:

(a)    The Premises shall be delivered to Tenant by Landlord in a neat and clean condition, free of all tenants and occupants, and free of all trade fixtures and the like.

(b)    The Premises shall be delivered in a structurally sound condition and with a completely watertight roof; and the plumbing, sprinkler system, HVAC system and utilities (including Tenant's telephone, voice and data cabling) shall be fully installed and in good working order and fully connected to operational public utility systems that Tenant may use subject only to Tenant paying applicable fees for consumption charged to all users. Waste disposal and treatment must be handled by an operational public sanitary sewer system (septic systems or temporary waste storage facilities are not acceptable).

(c)    The Premises shall be delivered in a so-called "turnkey" condition in conformance with Tenant's guideline plans and specifications and in a condition ready for installation and delivery of Tenant's equipment, trade fixtures and signs, so that Tenant may commence operations in the normal course upon delivery of the Premises by Landlord to Tenant.

2.    Plans and Specifications. Landlord and Tenant agree with respect to plans and specifications as follows:

(a)    All plans and specifications, including shop drawings, to be used for Landlord's Work relating to the Premises and Common Areas shall be subject to the prior written approval of Tenant.

(b)    Within thirty (30) days following the execution of this Lease, Landlord shall submit to Tenant three (3) sets of complete working drawings for Landlord's Work relating to the Premises (the "Preliminary Plans and Specifications"). Within twenty (20) days after receipt of the Preliminary Plans and Specifications, Tenant shall notify Landlord in writing of its approval or disapproval thereof (such approval not to be unreasonably withheld), in the latter event specifying the reasons therefor. Within fifteen (15) days after receipt of Tenant's notice, Landlord shall resubmit the Preliminary Plans and Specifications for Tenant's approval appropriately modified to accommodate the objections, if any, contained in Tenant's notice. The Preliminary Plans and Specifications, as modified to accommodate Tenant's objections, shall be referred to as the "Final Plans and Specifications". Except at its own risk, Landlord shall not commence any portion of Landlord's Work relating to the Premises until the Final Plans and Specifications have been approved by Tenant. As part of the Preliminary Plans and

I-613757.1
11/16/2004
13770.06

Specifications, Landlord shall furnish an exhibit, acceptable to Tenant, setting forth the HVAC specifications and criteria for an educational facility.

(c)     Any subsequent changes to the Final Plans and Specifications relating to the Premises or to any shop drawings shall require the prior written approval of Tenant.

3.     Permits. All permits required for Landlord's Work shall be obtained by Landlord. Landlord agrees to cooperate with Tenant with respect to obtaining any permits for work to be done by Tenant.

4.     Construction Standards. All of Landlord's Work shall be done in a good and first-class workmanlike manner in accordance with all applicable laws, ordinances, codes and insurance requirements.

5.     Possession Date. For the purposes of this Lease, the "Possession Date" shall occur when all the following conditions are satisfied: (i) all of Landlord's Work (as defined herein) has been completed in safe, sound operating condition and is in compliant with all applicable laws, (ii) Tenant's architect has certified that all of Landlord's Work has been completed in accordance with all working drawings and specifications approved by Tenant (minor punch list items excepted), (iii) all Building services are available to Tenant's Premises, (iv) a temporary occupancy permit has been issued by the appropriate governmental authorities, (v) all common areas on Tenant's floors are complete and available for use by the public, including installation of all finishes, (vi) all proper governmental approvals have been obtained to permit Tenant's occupancy of the Premises, (vii) installation of voice and data cabling and systems furniture, (viii) a Non-Disturbance Agreement has been secured by and between Tenant and Landlord's lienholders; (ix) Landlord shall have given fifteen (15) days' advance written notice to Tenant of the Possession Date; (x) the Premises are ready for exclusive occupancy by Tenant; (xi) a permanent certificate of occupancy or equivalent document is obtainable but for items to be completed by Tenant with respect to the installation of its fixtures and the construction of its leasehold improvements, if any; and (xii) construction of the Premises and all other aspects of Landlord's Work have been completed in accordance with the Final Plans and Specifications subject only to minor punch list items of such nature that do not interfere with Tenant's fixturing and with Tenant's normal use and occupancy of the Premises.

6.     Tenant's Access. So long as Tenant does not interfere with the completion of Landlord's Work, Landlord shall use commercially reasonable efforts to give Tenant access to the Premises for at least fifteen (15) days prior to substantial completion of Landlord's Work (the "Early Access Period") for purposes of installing Tenant's furniture, fixtures and equipment ("Tenant's Work"). Landlord will use its commercially reasonable efforts to provide Tenant with reasonable prior notice as to when the Early Access Period will commence based upon a schedule to be reasonably established by Landlord's contractor. Tenant's Work shall be performed by Tenant at Tenant's sole cost and expense. Tenant agrees to provide Landlord with prior notice of any such intended early access and shall fully cooperate with Landlord and Landlord's contractor during the Early Access Period so as not to interfere with the completion of Landlord's Work. The Early Access Period shall be subject to all the terms and conditions of this Lease, except that Tenant shall not be required to pay Rent during such period.

C-2

7.    Permits. If at any time after the execution of this Lease Landlord is advised by any governmental agency in a final, non-appealable notice ("Official Notice") that the governmental permits and approvals required for Landlord's Work (including, without limitation, any permits and approvals required for the signs of Tenant described in this Lease) will not be issued, or Landlord determines (with or without Official Notice) that such approvals and permits will not be issued, Landlord shall promptly so advise Tenant and at any time thereafter, but prior to Landlord having obtained such permits and approvals, Tenant have the right to terminate this Lease by giving Landlord written notice thereof.

8.    Construction Commencement Date. If Landlord has not commenced the construction of the Premises prior to January 20, 2005 (the "Construction Commencement Date"), then at any time thereafter, but prior to Landlord commencing construction of the Premises, Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof.

9.    Rent Abatement; Holdover Rent. If the Possession Date has not occurred on or prior to February 28, 2005, Tenant shall be entitled to occupy the Premises on a rent-free basis (i.e., no Base Rent or Tenant Charges being owed) for one day subsequent to the Rent Commencement Date for each day that such Possession Date is delayed past the Delivery Date. If the Possession Date has not occurred on or prior to February 28, 2005, Landlord shall, within ten (10) days after written demand therefor, reimburse Tenant for any holdover rent premium Tenant pays to its landlord ("Grandview Landlord") under its existing lease for premises located at 1015 Grandview Ave, Glendale, California 91201.

10.    Indemnification. Landlord shall indemnify Tenant against any and all liabilities, losses, damages, judgments, fines, demands, claims, costs and expenses (including, but not limited to, reasonable attorneys' fees and court costs) brought by Grandview Landlord arising out of or related to the failure of the Possession Date to occur on or prior to February 28, 2005.

11.    Late Fee. If the Possession Date has not occurred on or prior to May 1, 2005 for any reason whatsoever (damage from earthquake excepted), Landlord shall immediately pay to Tenant a late fee in the amount of One Hundred Thousand Dollars ($100,000.00).

12.    Termination. If the Possession Date has not occurred on or prior to May 31, 2005, Tenant shall have the right to terminate this Lease by giving written notice to Landlord at any time prior to the occurrence of the Possession Date.

C-3

EXHIBIT D

BASE RENT ADJUSTMENT

1.    <u>Increases in Base Rent</u>.  On each anniversary of the Commencement Date throughout the Term and any Renewal Term, the annual Base Rent shall be increased in accordance with the following table, based on thirty-five thousand (35,000) rentable square feet in the Premises (with Base Rent being calculated using 30,000 square feet for the first two (2) Lease Years):

<u>Base Rent During the Term</u>

| Lease Year | Annual Base Rent | Monthly Installment of Base Rent | Annual Rental Rate per Rentable Square Foot |
|---|---|---|---|
| First Lease Year | $660,000.00 | $55,000.00 | $22.00 |
| Second Lease Year | $673,200.00 | $56,100.00 | $22.44 |
| Third Lease Year | $801,150.00 | $66,762.50 | $22.89 |
| Fourth Lease Year | $817,250.00 | $68,104.17 | $23.35 |
| Fifth Lease Year | $833,700.00 | $69,475.00 | $23.82 |
| Sixth Lease Year | $850,500.00 | $70,875.00 | $24.30 |
| Seventh Lease Year | $867,650.00 | $72,304.17 | $24.79 |
| Eighth Lease Year | $885,150.00 | $73,762.50 | $25.29 |
| Ninth Lease Year | $903,000.00 | $75,250.00 | $25.80 |
| Tenth Lease Year | $921,200.00 | $76,766.67 | $26.32 |

D-1

Base Rent During the First Renewal Period (if Applicable)

| Lease Year | Annual Base Rent | Monthly Installment of Base Rent | Annual Rental Rate per Rentable Square Foot |
|---|---|---|---|
| Eleventh Lease Year | $938,700.00 | $78,225.00 | $26.82 |
| Twelfth Lease Year | $956,200.00 | $79,683.33 | $27.32 |
| Thirteenth Lease Year | $973,700.00 | $81,141.67 | $27.82 |
| Fourteenth Lease Year | $991,200.00 | $82,600.00 | $28.32 |
| Fifteenth Lease Year | $1,008,700.00 | $84,058.33 | $28.82 |

Base Rent During the Second Renewal Period (if Applicable)

| Lease Year | Annual Base Rent | Monthly Installment of Base Rent | Annual Rental Rate per Rentable Square Foot |
|---|---|---|---|
| Sixteenth Lease Year | $1,026,200.00 | $85,516.67 | $29.32 |
| Seventeenth Lease Year | $1,043,700.00 | $86,975.00 | $29.82 |
| Eighteenth Lease Year | $1,061,200.00 | $88,433.33 | $30.32 |
| Nineteenth Lease Year | $1,078,700.00 | $89,891.67 | $30.82 |
| Twentieth Lease Year | $1,096,200.00 | $91,350.00 | $31.32 |

D-2

EXHIBIT E

## RULES AND REGULATIONS

Rules and Regulations.  Except as set forth below in this paragraph, the following rules and regulations are intended to govern both the Tenant and all other tenants in the Building and are intended to be for the benefit of Tenant and all of the other tenants in the Building.  The purpose of the following rules and regulations is to maintain a first-class building and they shall be construed and administered at all times so as to implement such intent.  Landlord agrees to require all tenants to be bound by these Rules and Regulations and to enforce the rules and regulations in a uniform and nondiscriminatory manner so as to maintain a first-class building.  Notwithstanding anything in this paragraph to the contrary, these rules and regulation shall not apply to 24 Hour Fitness (or its assignee or successor), but shall apply to future tenants in the Building.

1.       Space for admitting natural light into any public area of the Building or the Premises shall not be covered or obstructed.

2.       Canvassing, soliciting and peddling in the Building and parking lot is prohibited.

3.       No deliveries of furniture, supplies or equipment shall be permitted through the main entrance area during normal working hours.

4.       No bicycles or vehicles of any kind shall be brought into or kept in or about the Premises.

5.       Tenant shall not cause or permit any unusual or objectionable odors to be produced upon or emanate from the Premises.

6.       Tenant shall not cause or permit any unusual or objectionable noise to be audible outside of the Premises.

7.       Tenant shall not throw or permit to be thrown anything out of windows, doors or down passages or elsewhere in the Building or to bring or keep any pets or other animals in the Building or commit or make any indecent or improper acts or do anything that will in any way obstruct, annoy, injure or interfere with other tenants, or those having business with them.

8.       Toilets and other like apparatus shall only be used for the purpose for which they were constructed.

9.       Tenant shall not store and/or place any material, crates, boxes, equipment, abandoned trailers or automobiles in the parking areas, driveways, lawns, sidewalks,

E-1

I-613757.1
11/16/2004
13770.06

thoroughfares, or any other location outside the Premises.

      10.    Tenant shall keep the Premises reasonably clean at all times and shall store all trash within the Premises or outside the Premises in trash containers acceptable to Landlord.

E-2

EXHIBIT F

<u>SIGNAGE</u>

To be added as per agreement with Landlord, and e-mail from Mark Knapp, of November 30, 2004. (attached)

F-1

EXHIBIT F

## Dan Sykes

| From: | Farrar, Josef [JFarrar@studley.com] |
|-------|-------------------------------------|
| Sent: | Tuesday, November 30, 2004 7:13 PM |
| To: | Dan Sykes |
| Cc: | Stephen Davis |
| Subject: | FW: signage |

**Attachments:** signage language.pdf

Dan:

In the interest of time go ahead with Mark's suggestion, and we will replace the exhibit once you have the sign design done.  Please fax a signature page to me as well.

Thanks

Josef
-----Original Message-----
**From:** Mark Knapp [mailto:mknapp@dornplatz.com]
**Sent:** Tuesday, November 30, 2004 4:10 PM
**To:** jfarrar@studley.com
**Subject:** signage

Josef,

The relevant language re signage is attached; it is relatively self explanatory, granting Tenant the right to put up pretty much whatever signage they want excepting some carveouts for 24 Hour Fitness.  Unfortunately as we discussed, it looks like Exhibit F, Depiction of Signage, fell through the cracks.  While our architect or the tenant's space planner could easily draw something up, my guess is that the tenant has a sign consultant whom they would utilize to design their signage.  So please let this email state, unequivocally, that we intend to approve and pay or (initially; changes to signage down the road are handled in the lease) whatever signage the tenant de  :s, as per the language attached hereto, and that we will have the signs designed ourselves, or by tenant's consultant, as they wish, ASAP; an exhibit can at that point be produced and added to the lease after the fact.  In the meantime I would suggest simply handwriting in, on Exhibit F, "To be added as per agreement with Landlord, and email from Mark Knapp, of November 30, 2004", and attach this email.

F-2

EXHIBIT G

FORM OF
MEMORANDUM OF LEASE

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:


William S. Sanderson, Esq.
Thomas Whitelaw & Tyler LLP
18101 Von Karman, Suite 230
Irvine, California 92612

*(SPACE ABOVE THIS LINE FOR RECORDER'S USE)*

MEMORANDUM OF LEASE

This Memorandum of Lease dated as of _____ is by and between: 240 NORTH BRAND ASSOCIATES, LLC, a California limited liability company, with its principal office at 344 North Central Avenue, Glendale, California 91203 ("Landlord"), and GLENDALE CAREER SCHOOLS, INC., a Nevada corporation with its principal office located at 150 West Brambleton Avenue, Norfolk, Virginia 23510 ("Tenant").

W I T N E S S E T H:

1.     Landlord and Tenant have entered into that certain Lease dated as of November __, 2004 (the "Lease"), pursuant to which Landlord leased to Tenant and Tenant leased from Landlord certain premises ("Premises") located in the City of Glendale, County of Los Angeles, State of California, more particularly described in the Lease, at the rental and upon all of the terms and conditions set forth in the Lease, which is incorporated herein by this reference.

2.     The Premises is located entirely within the commercial development described on Exhibit A attached hereto and incorporated by reference herein.

3.    The Premises is leased for a term of ten (10) years ("Term") from the "Commencement Date" (as defined in the Lease), subject to earlier termination and extension in accordance with the terms and conditions of the Lease.

4.    The Lease grants Tenant two 5-year options to extend the Term of the Lease, subject to the terms and conditions set forth in the Lease.

5.    The use and occupancy by Tenant of the Premises shall include the non- exclusive use of the Common Area, as described in the Lease.

6.    Should there be any inconsistency between the terms of this instrument and terms of the Lease, the terms of the Lease shall prevail.

IN WITNESS WHEREOF, each of the parties hereto has executed this instrument as of the date first above written.

LANDLORD:          240 NORTH BRAND ASSOCIATES, LLC
                   a California limited liability company


By _____

          Name: _____
          Title: _____


TENANT:            GLENDALE CAREER SCHOOLS, INC.
                   a Nevada corporation


By _____

          Name: _____
          Title: _____

G-2

STATE OF _____ )
                                                  ) ss.
COUNTY OF _____ )

On _____, before me, _____, a Notary Public in and for said state, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public in and for said State

(SEAL)

STATE OF _____ )
                                                  ) ss.
COUNTY OF _____ )

On _____, before me, _____, a Notary Public in and for said state, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public in and for said State

(SEAL)

I-613757.1
11/16/2004

## EXHIBIT A

## LEGAL DESCRIPTION

Lots 23 and 24 and those portions of Lots 1 and 2 lying Westerly of a line parallel with and distant Easterly 200 feet from the Westerly lines of Lots 23 and 24, all in Block 5 of Glendale Boulevard tract, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 5 Page 167 of Maps, in the Office of the County Recorder of said County.

G-4

EXHIBIT H

## HVAC SPECIFICATIONS

HVAC SPECIFICATIONS

Heating and Air conditioning will be provided throughout the occupied Premises utilizing floor and/or ceiling mounted heat pumps, ductwork, diffusers and return grills as necessary to maintain reasonably comfortable temperatures throughout the Premises. Reasonably comfortable temperatures are defined as an average of $73^\circ$ to $76^\circ$ F during the cooling season and $68^\circ$ to $72^\circ$ F during the heating season.

The equipment shall operate in compliance with California's Title 24 requirements.

H-1

EXHIBIT B

## FIRST AMENDMENT AND SUPPLEMENT TO LEASE

THIS FIRST AMENDMENT AND SUPPLEMENT TO LEASE (this "Amendment") is dated as of May _15_, 2007 by and between FEY 240 NORTH BRAND LLC, a California limited liability company ("Landlord"), and GLENDALE CAREER SCHOOLS, INC., a Nevada corporation ("Tenant").

## RECITALS

A.      Landlord, as landlord, and Tenant, as tenant, have previously executed and delivered that certain Lease dated as of November 30, 2004, including that certain Lease Addendum dated as of November 30, 2004 attached thereto (collectively, the "Lease"). Landlord was mistakenly identified as "240 North Brand Associates, LLC" in the Lease.

B.      Landlord and Tenant desire to amend and supplement the Lease on the terms set forth herein.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Definitions and Inconsistencies.  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Lease.  This Amendment shall amend and supplement the Lease, and the provisions set forth below shall supersede any inconsistent provisions set forth in the Lease.

2.      Initial Term.  The Initial Term of the Lease shall be three (3) years.  Section I.F. of the Lease is hereby deleted in its entirety and replaced as follows:

F.      Initial Term.  Three (3) years, beginning on the Commencement Date and ending on the Expiration Date.  The "Expiration Date", as used herein, shall mean the day immediately preceding the third anniversary of the Commencement Date.

All other references in the Lease to the Initial Term being longer than three years, or to Lease Years 4 through 10, or any other words of similar import, shall be reasonably construed in a manner consistent with the intent of this Amendment to shorten the Initial Term of the Lease.

3.      Premises.  Section I.D. of the Lease is hereby modified to provide that the Premises shall consist of approximately 29,590 square feet of Rentable Area in the Building that may be used for Tenant's career/technical school and an additional 5,410 square feet of Rentable Area in the Building (the "Storage Area") that may be used for storage purposes, but not classroom, office or any other use that would generate a need for additional parking, as generally shown on the floor plan attached to this Amendment as Exhibit B (which exhibit is hereby substituted for Exhibit "B" attached to the Lease).  If Tenant is unable to use the Storage Area

because such use would be in violation of the conditional use permit applicable to Tenant's use of the Premises or other code or requirement of the City of Glendale, the Storage Area shall be deleted from the Premises, the Rentable Area of the Premises shall be reduced to 29,590 square feet, Base Rent shall be reduced to reflect the proportionate reduction in the Rentable Area of the Premises and Tenant's percentage of Tenant Charges shall be based on such reduced Rentable Area of the Premises.

4.    Base Rent.  Base Rent during the first Lease Year of the Initial Term shall be $801,150.00 per annum, payable in equal monthly installments in advance.  Base Rent during the second Lease Year of the Initial Term shall be a fixed sum equal to $817,250.00 per annum, payable in equal monthly installments in advance.  Base Rent during the third Lease Year of the Initial Term shall be a fixed sum equal to $833,700.00 per annum, payable in equal monthly installments in advance.  Section I.I, Section 5(a)(ii) and Exhibit "D" of the Lease are hereby deleted in their entirety.

5.    Tenant Charges.  Section I.M. of the Lease is hereby deleted in its entirety and replaced as follows:

M.    Initial Tenant Charges.  One-hundred thousand four hundred fifty and 00/100 dollars ($100,450.00) per year; eight thousand three hundred seventy and 83/100 dollars ($8,370.83) per month; based on an annual rate of $2.87 per square foot of Rentable Area in the Premises.

6.    Renewal Options.  Tenant shall have no options to renew or extend the term of the Lease.  Section I.H. and Section 3 of the Lease are hereby deleted in their entirety.  All other references in the Lease to any renewal or extension option exercisable by tenant, or any renewal or extension term relating thereto, shall be null and void.

7.    Surrender; Holdover.  Section 31 of the Lease is hereby deleted in its entirety and replaced as follows:

31.    Surrender; Holdover.  Upon expiration or earlier termination of this Lease, Tenant shall surrender the Premises and all property of Landlord in good and clean condition, ordinary wear and tear and damage caused by insurable casualty and causes beyond the control of Tenant excepted.  If Tenant remains in possession of the Premises or any part thereof after the expiration or earlier termination of this Lease, such occupancy shall be a tenancy at sufferance and Base Rent shall be payable by Tenant to Landlord monthly in advance at a rate equal to 150% of the Base Rent payable immediately prior to the expiration or earlier termination.  In addition to Base Rent at such rate, Tenant shall pay Tenant Charges and all other sums payable by Tenant to Landlord hereunder during such tenancy at sufferance.

2

8.      Exhibit C.

(a)     The "Final Plans and Specifications" contemplated by Paragraph 2 of Exhibit "C" of the Lease are described on Exhibit C attached to this Amendment.

(b)     Landlord and Tenant agree that Paragraph 8 of Exhibit "C" of the Lease is hereby modified to provide that if Landlord has not re-commenced construction of the Tenant Improvements in the Premises on or prior to June 1, 2007 (the "Construction Re-Commencement Date") and does not thereafter diligently and continuously prosecute such Tenant Improvements to completion, Tenant shall have the right to terminate the Lease by giving Landlord written notice thereof or exercise the self-help right described in Paragraph 8(e) below.

(c)     (i)     With respect to Paragraph 9 of Exhibit "C" of the Lease, Landlord and Tenant acknowledge that through January, 2007 a total of $1,295,626.11 of holdover rent has been paid to the Grandview Landlord ("Grandview Holdover Rent"), of which $56,331.57 has been reimbursed by Landlord to Tenant, leaving a total balance due from Landlord to Tenant of $1,239,294.53. Tenant shall be entitled to offset such sum, and the $100,000.00 late fee owed by Landlord to Tenant pursuant to Paragraph 11 of Exhibit "C" of the Lease, together with interest thereon at the rate of six percent (6%) per annum from the date paid by Tenant with respect to the holdover rent and from May 1, 2005 with respect to the $100,000.00 late fee, against all Rent payable under the Lease as amended by this Amendment until such sums are either offset or paid in full by Landlord to Tenant. As of February 1, 2007, the total amount due for the holdover fee, and the late fee, plus interest thereon as provided above, is $1,428,999.41. Notwithstanding the foregoing, Tenant shall not be permitted to offset the foregoing amounts against any payments due from Tenant to Landlord for reimbursement of the actual cost of utilities provided to the Premises or the separate HVAC system serving the Premises in accordance with the Terms of the Lease. For avoidance of doubt, however, the foregoing shall not prohibit Tenant from offsetting such amounts against payments due from Tenant with respect to Tenant Charges under the Lease. In addition, Landlord and Tenant agree that Tenant shall provide its own janitorial service for the Premises at Tenant's sole cost and expense and that janitorial services shall be excluded from Operating Expenses under the Lease.

(ii)    Notwithstanding the foregoing, except as otherwise provided below in this Amendment, Tenant's right of offset provided under Paragraph 8(c)(i) above shall be limited each month to the amount by which the total Rent payable by Tenant under the Lease for such month exceeds the sum of $33,000.00 per month.

(iii)   Landlord shall continue to be responsible for reimbursement to Tenant of all holdover premiums paid to the Grandview Landlord through and including the month following the month in which the Commencement Date under the Lease occurs (or such earlier date as Tenant's obligation to pay Grandview Holdover Rent terminates).   On the Commencement Date Landlord shall pay to Tenant an amount equal to the Grandview Holdover Rent for the period of time commencing with February 2007 and ending on the month following the month in which the Commencement Date occurs (or such earlier date as Tenant's obligation to pay Grandview Holdover Rent terminates).   If Landlord fails to pay such sums as required under this Paragraph 8(c)(iii), such unpaid amounts, plus a service charge equal to two percent

3

(2%) of such amount, shall be added to the foregoing amounts to be offset against the Rent under this Lease and shall accrue interest thereon as provided above, and Tenant's offset rights with respect to these amounts shall not be subject to the limitation of Paragraph 8(c)(ii) above (with Tenant being entitled to offset such amounts against the $33,000.00 per month amount until reimbursed, with interest, in full).

(iv)    As security for the sums due from Landlord to Tenant described in this Paragraph 8(c), Landlord, at Landlord's sole cost and expense, shall provide Tenant with a second deed of trust on the Project securing such obligations in form and substance satisfactory to Tenant. On or prior to May 25, 2007, Landlord, at Landlord's expense, will provide Tenant with (A) a title insurance commitment/binder or report on the Project showing no liens other than the first deed of trust encumbering the Project, and (B) a statement from the first deed of trust lender showing the current balance of all principal, interest and other sums due under the loan secured by such first deed of trust. In addition, on or prior to June 15, 2007, Landlord, at Landlord's expense, will provide Tenant with an appraisal prepared by an MAI appraiser reasonably satisfactory to Tenant establishing a fair market value for the Project exceeding all outstanding sums due under the loan secured by the first deed of trust by at least $2,000,000.00. The second deed of trust will be recorded and a lender's title insurance policy for the benefit of Tenant provided insuring Tenant's second lien position no later than June 23, 2007, all at Landlord's expense. If any of the foregoing requirements are not satisfied on or prior to the applicable date set forth above, the provisions of Paragraph 8(c)(ii) limiting Tenant's offset right will be of no further force and effect, and Tenant will be entitled to offset all amounts due from Tenant to Landlord during the Term of the Lease. No later than the beginning of the third Lease Year, Landlord, at Landlord's expense, agrees to provide Tenant with a letter of credit, in a form and from a financial institution reasonably satisfactory to Tenant, covering the then-outstanding balance of amounts due from Landlord to Tenant described in this Paragraph 8(c) that have not been previously offset by Tenant against Rent or paid by Landlord, together with all interest that will accrue on such amounts prior to final payment thereof. The second deed of trust to be granted for the benefit of Tenant will be released at any time upon a provision of such a letter of credit.

(v)    Any sums due from Landlord to Tenant that are not previously offset by Tenant against the Rent under the Lease or paid by Landlord, together with all interest thereon, shall be due and payable in full from Landlord to Tenant by the first day of the last month of the Term of the Lease. If Landlord fails to pay such sums on or prior to such date, Tenant shall be entitled to call upon the letter of credit and apply proceeds thereof to payment of such sums (or declare a default and institute foreclosure proceedings under the second deed of trust if the letter of credit has not been provided).

(d)    Landlord and Tenant agree that Paragraph 12 of Exhibit "C" of the Lease is modified to change the date set forth therein from "May 31, 2005" to "August 30, 2007."

(e)    If Landlord fails to re-commence construction of the Tenant Improvements in the Premises on or prior to the Construction Re-Commencement Date and thereafter diligently and continuous prosecute such Tenant Improvements to completion, or if the Possession Date has not occurred by August 30, 2007, Tenant shall have the right to enter the Premises and complete

4

the Tenant Improvements on Landlord's behalf and take such other actions as may be reasonably necessary to cause the occurrence of the Possession Date, all at Landlord's cost and expense. Tenant shall be entitled to offset all costs and expenses incurred by Tenant in connection therewith, together with interest thereon from the date incurred at the rate of six percent (6%) per annum, from all Rent payable under the Lease. Tenant's offset right under this Paragraph 8(e) shall not be subject to the limitations set forth in Paragraph 8(c)(ii) above, with Tenant having the right to offset such sums against the $33,000.00 per month amount referenced therein. Landlord agrees to cooperate with Tenant in the event Tenant exercises its right of self-help under this provision, including assigning Landlord's construction contract for the Tenant Improvements to Tenant if Tenant so desires.

9.      Moving/FF&E Allowance.  Landlord agrees to pay Tenant the sum of $40,000.00 on the Commencement Date as a contribution towards Tenant's moving/relocation costs and FF&E expenses. Tenant shall have the right to offset such amount, together with interest thereon at the rate of six percent (6%) per annum from the Commencement Date until fully paid or offset, against all Rent payable under the Lease if such amount is not paid by Landlord on the Commencement Date.

10.     Landlord's Notice Address.  Landlord's address for purposes of notice required or permitted to be given under the Lease (a) by overnight courier service is 210 South Orange Grove Boulevard, Pasadena, California  91105, Attention:  Mark S. Knapp; and (b) by registered or certified mail is P.O. Box 50025, Pasadena, California  91115, Attention:  Mark S. Knapp.

11.     Amendment.  Except to the extent specifically modified by this Amendment, all terms of the Lease shall remain in full force and effect. Unless otherwise specifically defined to the contrary in this Amendment, the defined terms used in this Amendment shall have the same definition and meaning as set forth in the Lease.

12.     Counterparts.  This Amendment may be executed in one or more counterparts, each of which shall, when taken together, constitute one agreement.

[SIGNATURE PAGE FOLLOWS]

I-741874.11

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first written above.

"LANDLORD"

FEY 240 NORTH BRAND LLC
a California limited liability company

By:_____
    Greg R. Galletly, Manager

"TENANT"

GLENDALE CAREER SCHOOLS, INC.,
a Nevada corporation

By:_____
    Name:
    Title:

6

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first written above.

"LANDLORD"

FEY 240 NORTH BRAND LLC
a California limited liability company


By:_____
    Greg R. Galletly, Manager


"TENANT"

GLENDALE CAREER SCHOOLS, INC.,
a Nevada corporation


By:_____
    Name: David R. Styles
    Title: Vice President


6

EXHIBIT B

Floor Plan Showing Premises

Page 1 of 2



I-741874.11

EXHIBIT B

Floor Plan Showing Premises

Page 2 of 2



I-741874.11

EXHIBIT C

Final Plans and Specifications

## LIST OF PLANS AND SPECIFICATIONS

Provided by Wirt Design Group Inc. dated January 11, 2007

Consisting of the following pages:

| | |
|---|---|
| 10.0 | **COVER SHEET** |
| 10.1 | **DISABLED ACCESS SITE PLAN** |
| 10.2 | **DISABLED GENERAL NOTES AND SECURITY NOTES** |
| 10.3 | **GENERAL NOTES AND DOOR SCHEDULE** |
| 10.4.1 | **BASEMENT LEVEL: OCCUPANCY PLAN** |
| 10.4.1a | **BASEMENT LEVEL: FURNITURE AND WINDOW PLAN** |
| 10.4.2 | **STREET LEVEL: OCCUPANCY PLAN** |
| 10.4.2a | **STREET LEVEL: FURNITURE AND WINDOW PLAN** |

| | |
|---|---|
| 11.1 | BASEMENT LEVEL: DEMOLITION PLAN AND NOTES |
| 11.2 | STREET LEVEL: DEMOLITION PLAN AND NOTES |
| 12.1 | BASEMENT LEVEL: PARITION PLAN AND NOTES |
| 12.2 | STREET LEVEL: PARTTITION PLAN AND NOTES |
| 13.1 | BASEMENT LEVEL: POWER AND SIGNAL PLAN AND NOTES |
| 13.2 | STREET LEVEL: POWER AND SIGNAL PLAN AND NOTES |
| 14.1 | BASEMENT LEVEL: REFLECTED CEILING PLAN AND NOTES |
| 14.2 | STREET LEVEL: REFLECTED CEILING PLAN AND NOTES |
| 15.1 | BASEMENT LEVEL: FLOOR FINISH PLAN AND NOTES |
| 15.2 | STREET LEVEL: FLOOR FINISH PLAN AND NOTES |
| 15.3 | BASEMENT LEVEL: WALL FINISH PLAN AND NOTES |
| 15.4 | STREET LEVEL: WALL FINISH PLAN AND NOTES |
| 16.1 | BASEMENT LEVEL: MILLWORK PLAN AND NOTES |
| 16.2 | STREET LEVEL: MILLWORK PLAN AND NOTES |

| | |
|---|---|
| 18.0 | CONSTRUCTION DETAILS |
| 18.1 | CONSTRUCTION DETAILS |
| 19.0 | MILLWORK ELEVATIONS |
| 19.1 | MILLWORK ELEVATIONS AND DETAIL |
| I10.0 | BASEMENT LEVEL: ENLARGED RESTROOM PLANS  AND ELEVATIONS |
| I10.0a | STREET LEVEL: ENLARGED RESTROOM PLANS AND ELEVATIONS |
| I10.1 | ENLARGED STAIR PLANS, ELEVATIONS, SECTIONS AND DETAILS |

FORM B104 (08/07)                                                                 2007 USBC, Central District of California

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Page 2) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>FEY 240 NORTH BRAND, LLC | DEFENDANTS<br>GCS/LES, LLC f/k/a Glendale Career Schools, Inc. |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Schock & Schock, alc<br>210 So. Orange Grove Blvd. Suite 200<br>Pasadena CA 91105 | ATTORNEYS (If Known)<br>Knapp, Peterson, & Clarke<br>550 No.Brand Blvd. 15th Floor<br>Glendale CA 91203 |
| PARTY (Check One Box Only)<br>☑ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor ☐ Other<br>☐ Trustee |

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach Contract, to Determine Validity of Lien, Declaratory Relief, and Quiet Title. 28 U.S.C. 1334; 157; 11 U.S.C. 544

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☑ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false
   representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement,
   larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
   (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state
   court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

RECEIVED
MAY 26 2010
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

FORM B104 (08/07), page 2                                                    2007 USBC, Central District of California

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| **NAME OF DEBTOR**<br><br>FEY 240 North Brand, LLC | | **BANKRUPTCY CASE NO.**<br><br>LA 2:09-bk-44228 - AA |
| **DISTRICT IN WHICH CASE IS PENDING**<br><br>Central | **DIVISIONAL OFFICE** | **NAME OF JUDGE**<br><br>Alan M. Ahart |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| **PLAINTIFF** | **DEFENDANT** | **ADVERSARY PROCEEDING NO.** |
| **DISTRICT IN WHICH ADVERSARY IS PENDING** | **DIVISIONAL OFFICE** | **NAME OF JUDGE** |
| **SIGNATURE OF ATTORNEY (OR PLAINTIFF)** | | |
| **DATE**<br><br>5/17/10 | **PRINT NAME OF ATTORNEY (OR PLAINTIFF)**<br><br>John P. Schock | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number | FOR COURT USE ONLY |
|---|---|
| SCHOCK & SCHOCK, ALC                [052781]<br>210 So Orange Grove Blvd. Suite 200<br>Pasadena CA 91105<br><br><br><br>*Attorney for Plaintiff* Fey 240 North Brand LLC | **RECEIVED**<br>**MAY 26 2010**<br>CLERK U.S. BANKRUPTCY COURT<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY_____ Deputy Clerk |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

| In re: Fey 240 North Brand LLC | CHAPTER  11 |
|---|---|
| | CASE NUMBER  2:09-bk-44228 AA |
| Debtor. | ADVERSARY NUMBER |
| Fey 240 North Brand LLC<br><br>Plaintiff(s),<br><br>vs.<br><br>GCS/LES, LLC, f/k/a Glendale Career Schools, Inc.<br><br>Defendant(s). | *(The Boxes and Blank Lines below are for the Court's Use Only) (Do Not Fill Them In)*<br><br>**SUMMONS AND NOTICE OF STATUS CONFERENCE** |

**TO THE DEFENDANT:** A Complaint has been filed by the Plaintiff against you. If you wish to defend yourself, you must file with the Court a written pleading, in duplicate, in response to the Complaint. You must also send a copy of your written response to the party shown in the upper left-hand corner of this page. Unless you have filed in duplicate and served a responsive pleading by _____, the Court may enter a judgment by default against you for the relief demanded in the Complaint.

A Status Conference on the proceeding commenced by the Complaint has been set for:

| Hearing Date: | Time: | Courtroom: | Floor: |
|---|---|---|---|
| ❑  **255 East Temple Street, Los Angeles** | | ❑  **411 West Fourth Street, Santa Ana** | |
| ❑  **21041 Burbank Boulevard, Woodland Hills** | | ❑  **1415 State Street, Santa Barbara** | |
| ❑  **3420 Twelfth Street, Riverside** | | | |

**PLEASE TAKE NOTICE** that if the trial of the proceeding is anticipated to take less than two (2) hours, the parties may stipulate to conduct the trial of the case on the date specified, instead of holding a Status Conference. Such a stipulation must be lodged with the Court at least two (2) Court days before the date set forth above and is subject to Court approval. The Court may continue the trial to another date if necessary to accommodate the anticipated length of the trial.

Date of Issuance: _____

**KATHLEEN J. CAMPBELL**
**Clerk of Court**

By: _____
*Deputy Clerk*

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*February 2010* (COA-SA)

**F 7004-1**

Summons and Notice of Status Conference  - *Page 2*    **F 7004-1**

| In re<br>Fey 240 North Brand LLC | (SHORT TITLE)<br><br>Debtor(s). | CASE NO.: 2:09-bk-44228 AA |
|---|---|---|

**NOTE**: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document described as _____
_____ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.   On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addressed indicated below:

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL (indicate method for each person or entity served):**
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*February 2010 (COA-SA)*    **F 7004-1**